# HADDER *v.* STATE

[No. 181, September Term, 1964.]

*Decided April 14, 1965.*

The cause was argued before PRESCOTT, C. J., and HORNEY, SYBERT, OPPENHEIMER and BARNES, JJ.

*Joseph A. DePaul,* with whom were *William A. Ehrmantraut* and *William H. Meserole, Jr.* on the brief, for appellant.

*Fred Oken, Assistant Attorney General,* with whom were *Thomas B. Finan, Attorney General,* and *Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* on the brief, for appellee.

PRESCOTT, C. J., delivered the opinion of the Court.

After his conviction of murder in the first degree by a jury in the Circuit Court for Prince George's County, the appellant, Hadder, has appealed.

He contends that the trial court erred: (1) in not granting his motions for judgment of acquittal; (2) in not requiring the State's Attorney to furnish everything he requested in a bill of particulars; (3) in permitting a deputy sheriff to sit at the counsel table during the hearings on two pre-trial motions; (4) in admitting into evidence statements and confessions made by the accused; and (5) in several of its advisory instructions to the jury.

About 1:15 a.m. on May 2, 1963, the body of Officer Alfred Steinat of the Prince George's County police was found over an embankment flanking Route 3-301 a short distance south of the Anne Arundel County line. On the road 35 to 40 feet away, his police cruiser—motor running, headlights on, red light flashing—attracted the attention of two Anne Arundel County policemen and led to the discovery of the body. The cause of death was a perforating gunshot wound which entered the chest, and, ranging downward, emerged from the left side of the victim's back near the beltline. According to an F.B.I. ballistics expert, the bullet was fired at a range of from 6 to 12 inches. A .45 slug dropped out of Officer Steinat's clothing during post mortem examination of the body.

Promptly after the discovery of the body the police roped off the area and, shortly after daybreak, began a search of the crime scene. Captain Rogato, in charge of the search, testified to the results. Steinat's .38 service revolver was found 18 feet from his body and 36 feet from the road. An automobile registration card was found 64 feet from the body and 17 feet from the edge of the road. Six .38 empty cartridge casings were recovered about 77 feet from the body and a .45 automatic pistol was found some 8 feet therefrom. A wallet was picked up 72 feet from the .45 gun, and 64 feet from the wallet a shoe was found.

The registration card was for the appellant's 1960 black Ford Falcon automobile. The wallet and shoe were identified as his. Ballistic testimony identified the .45 slug found inside the dead

policeman's clothing as having been fired from the automatic pistol found at the crime scene, and a Virginia gun dealer identified the same pistol as the one he sold the appellant a few days earlier. The six .38 empty cartridge casings were identified as having been fired from Officer Steinat's service revolver.

Examination of the police car revealed the radio microphone off its hook and a bullet hole in the dashboard. A badly damaged .45 slug was found therein, and a cork-tipped cigarette butt was discovered on the floor near the right front seat. An empty .45 cartridge casing was found on the rear seat.

The appellant, disheveled and wearing one shoe, appeared at the home of John M. Wist near Odenton in the early evening of May 2nd. He said he was sick and asked Wist to call the Rescue Squad. Three of the four members of the ambulance crew, the fourth being at the time of the trial a patient in the hospital, testified that the appellant, upon entering the ambulance, said that he was the one who shot the policeman. The testimony was first taken out of the presence of the jury and later repeated to the jury. The witnesses were in agreement that the appellant had volunteered the statement without any inducement.

The appellant made a second statement, while being transported in a State Police car to a rendezvous with Prince George's County police, about the shooting of Officer Steinat. Trooper Reginald Gibson and other witnesses quoted the appellant as saying that the officer stopped him, and he intended to take the officer's gun and auto keys to make good his escape. The officer saw him take a gun from his belt, there was a struggle and the gun went off, and he knew the officer was shot. This testimony was also first taken out of the presence of the jury. All witnesses who heard the statement testified that it was made voluntarily. The appellant objected to the admission of the statements into evidence but declined to offer any testimony on the issue of voluntariness. The objection was overruled and the same testimony was taken before the jury.

There was testimony that the appellant made a third statement after his custody had been transferred from Trooper Gibson to Inspector Purdy, Captain Huber and Detective Flynn, all of the Prince George's County police, and Special Agent

Sibert of the Federal Bureau of Investigation. En route to Police Headquarters at Seat Pleasant, according to Agent Sibert, the appellant started to volunteer a statement. Detective Flynn interrupted and said, "Now wait a minute. You don't have to say anything. You know that anything you say can be held against you."

Agent Sibert testified that the appellant described the shooting of Officer Steinat and said that before leaving his car on a nearby military reservation he had tried to commit suicide by cutting his wrists. When he surrendered he asked that the Rescue Squad be called because he was afraid to notify the police. He feared that he would be shot because he had killed a police officer.

Captain Huber testified that the appellant made a statement after Detective Flynn advised him that he need not say anything and that any statement he made could be used against him. According to Captain Huber, the appellant said the policeman stopped him and asked for his driver's license and registration card. He had no driver's license. The officer asked him if he had purchased a tire without paying for it, and the appellant admitted he had.

When the officer asked him if he wanted to straighten the matter out, the appellant replied in the affirmative, and they went to the police car which was parked in front of the appellant's automobile. Captain Huber testified that the appellant said he was armed with a .45 automatic, which he had bought in Virginia, and had made up his mind that he was not going to be locked up. The appellant said he had guns and illicit whiskey in the trunk and did not want them found. According to Captain Huber, the appellant said his intention was to take the officer's keys, pistol and car and escape, and when he pulled out his gun the officer grabbed for it, there was a struggle, and the gun went off. He jumped out and ran. The officer fired several shots.

Detective Flynn's testimony agreed with Captain Huber's. He quoted the appellant as saying further that he had the .45 pistol in the left side of his "pants" when he walked to Officer Steinat's car, that he sat on the right front seat, lit a cigarette and took several puffs; and when Steinat reached for the radio,

he felt that was his opportunity and pulled the gun. After the gun discharged, Steinat wrested it from him and he fled. On returning to the scene, continued Detective Flynn's testimony, the appellant said he got into his own car and drove north several miles, turned around, and decided to try to find his gun, drove past the scene, made a U-turn, came back and parked behind the police car. He was unable to find the officer and so was unable to get his gun. He saw a briefcase in the police car, took it, and drove away.

All witnesses who heard the appellant's statement made to Prince George's County police en route to Seat Pleasant testified that it was voluntarily made. The appellant declined to offer any evidence on the admissibility of the statement and objected to it on the ground that the State had not met the burden of proof of voluntariness. He argued that any statement he made could not pass the legal test of voluntariness because of his physical and mental condition at the time. Witnesses had variously described the appellant's condition as that he "looked sick," "looked awfully pale," "didn't look too well," "looked scared," "thought he was drunk," "appeared exhausted," "wobbled or swayed." Dr. John Kehoe, who saw the appellant about 10:00 p.m., shortly after his arrival at Seat Pleasant Police Headquarters, testified that he gave him a physical examination and that he appeared to be in good health and not fatigued. The cuts on his wrist and arm were superficial. The appellant's objection was overruled, the statement was ordered received in evidence and it was then testified to in the presence of the jury.

A Maryland State Trooper testified that in the early morning of May 3, 1963, while on routine patrol, he discovered a black Ford Falcon automobile with Virginia license plates abandoned on a side road in a wooded area in the vicinity of Fort Meade. In the car were a briefcase and scattered police report forms. The Falcon was identified as the appellant's automobile.

Two witnesses, the Richelson brothers, testified that they encountered the appellant about 11:00 p.m. not far from the scene of the shooting of Officer Steinat. They said that he flagged them down on Route 50 near its intersection with Route 301 and solicited their help to get a flat tire fixed on his small black sedan. They went to a nearby Esso station on his behalf.

The State then produced the gas-station attendant who testified that shortly after 11:00 p.m., he responded to the relayed call for assistance. He identified the appellant and told how he supplied a new tire for the black Falcon with Virginia license tags. He testified that the appellant offered to pay the $20.00 charge with a $50.00 traveler's check, which he could not change, and that it was agreed the appellant would follow him back to the gas station. The attendant said he observed that one of the Falcon's headlights was out. At the interchange of Routes 50, 301 and 3, the appellant and the witness lost each other. Believing that the maneuver was done deliberately to avoid payment for the tire, the attendant said he returned to the station and called Prince George's County police. Officer Steinat arrived a few minutes before midnight and made out a report. An executed report form found on a clipboard in Officer Steinat's car was entered in evidence with the stipulation that the incident was not to be deemed larceny because of a reference to tire larceny on the report.

The police dispatcher last heard the voice of Officer Steinat at 12:11 a.m. A Texaco station attendant at the intersection of Routes 3 and 450 testified that he could see the flashing light of a police cruiser about a quarter mile north at 12:30 a.m. It was still there thirty minutes later.

Another witness testified that about 1:00 a.m., from the same Texaco station, he observed the police car with lights on and door open. He said that he saw a black Falcon with one headlight pass the police cruiser going south, make a U-turn and pull up behind the police car. A man whom he could not see clearly enough to describe got out of the Falcon, jumped in the police car, then returned to the Falcon and drove off north in the direction of Baltimore. He said that, upon approaching the police car, he saw the policeman's hat on the back seat, a flashlight on the floor and the radio off its hook. He left to report the matter, and, when he returned, Anne Arundel County police were on the scene.

I

We have set forth the testimony at some length, because of the serious nature of the offense and appellant's challenge of

the sufficiency of the evidence to sustain his conviction. This claim will be disposed of without undue elaboration. It should be apparent that the above-related evidence (if admissible) was sufficient to take the case to the jury on either, or both, of two theories: a wilful, deliberate, and premeditated homicide (Code [1957] Article 27, Section 407) ; or a killing in the perpetration, or attempted perpetration, of a robbery. Code (1964 Supp.), Article 27, Section 410. Appellant's determination, while armed with a high-caliber pistol, not to be locked up because of a possible discovery of the guns and illicit whiskey in his car, his actual use of the pistol, and the evidence of what occurred thereafter were sufficient to support a finding by the jury (if it did so find) that the homicide was wilful, deliberate, and premeditated. Cf. *Cummings v. State*, 223 Md. 606, and cases cited therein. And see case notes in 13 Md. L. Rev. 327 and 21 Md. L. Rev. 349. Also, his determination to take the officer's keys, pistol and car so that he could escape, his actual use of the pistol, and the evidence concerning the subsequent events were ample to warrant a finding by the jury (if it did so find) that the officer was killed in the perpetration, or attempted perpetration, of a robbery. *Midgett v. State*, 216 Md. 26.

## II

Appellant's counsel filed a request for a bill of particulars. Maryland Rule 715. For several recent cases dealing with similar requests, see *Stevens v. State*, 232 Md. 33, *Pearlman v. State*, 232 Md. 251, and *Seidman v. State*, 230 Md. 305. Appellant's request asked for a number of items, including one for the particulars as to "the * * * hypothesis of commission" of the crime charged. We assume that this was an expression of a desire to make the State give the defense its theory of the case. All of the particulars requested were furnished except this one, and the appellant, without citing a single authority which states that it is proper to require the prosecution to state its theory of a case under a request for particulars, claims prejudicial error.

The contention misconceives the right, *vel non,* to, and the function and office of, a bill of particulars. As a general rule, particulars are not granted as a matter of right, but the grant-

ing and denial thereof rest in the sound discretion of the trial court, *Pearlman v. State, supra;* however, the courts of Maryland rightfully have been quite liberal in granting such particulars on proper occasions, and especially when indictments have been drawn in the short forms permitted by statute.

But bills of particulars are intended to guard against the taking of an accused by surprise by limiting the scope of the *proof*. *Berger v. State,* 179 Md. 410; *Hunter v. State,* 193 Md. 596. They have never, to our knowledge, been utilized for the purpose of requiring the State to elect a theory upon which it intends to proceed. As the Court succinctly stated in *Rose v. United States,* 149 F. 2d 755 (C.A. 9) : "The purpose of a bill of particulars is to secure facts, not legal theories." In *United States v. Fruehauf,* 196 F. Supp. 198 (U.S.D.C., S.D.N.Y.), the Court named five theories upon which the prosecution might proceed, but denied a motion for a bill of particulars which asked that the Government be required "to state which of the theories it is relying upon and to state, if its claim is based upon any other contention or premise, what such contention or premise is." See also 4 *Wharton's Criminal Law & Procedure* (Anderson), § 1867; Anno.: 5 A.L.R. 2d, at p. 459; *United States v. Dilliard,* 101 F. 2d 829 (C.A. 2), *cert. den.* 306 U. S. 635. We hold that, under the circumstances here involved, the appellant was not entitled to make the prosecution select and state its theory of the case.

III

This assignment of error arose as follows. On February 12, 1964, a hearing was held to determine whether appellant was indigent. Appellant, charged with murder, was brought to the hearing, handcuffed to two officers, who sat at, or near, the counsel table in order to remain close to the accused. The court (Judge Powers) refused to require the officers to remove the handcuffs from the appellant. Similar circumstances prevailed at a hearing held on March 5, 1964, on a motion for discovery before Judge Loveless. At this hearing, the court required the removal of the handcuffs from one arm.

Appellant says this action of the court "effectively and completely" prevented his having "full enjoyment" of communi-

cating with his attorney, and he was thereby denied due process. The contention is without merit. There are several answers to the claim, but the short, and complete, one is that appellant prevailed in his requests at both hearings. Judge Powers held that he was indigent and two lawyers were appointed to defend him. At the later hearing, Judge Loveless ruled that appellant was entitled to the discovery of the matters asked for, and the record discloses no claim that he was denied such discovery. Also, there is no contention that at any other time or times was appellant denied the right to confer and to counsel with his lawyers. We hold there was no error here.

## IV

This contention has two thrusts, which have been designated by appellant as (a) and (b).

### (a)

In considering this subheading, we shall also resolve two of his contentions in regard to the court's advisory instructions, for the questions are interrelated to such an extent that individual answers thereto would overlap appreciably. These three contentions, briefly stated, are: that defendant's statement "in the nature of a confession" that he intended to rob the officer "is wholly uncorroborated by any evidence, real or circumstantial," hence it should not have been admitted; that the court gave, to the jury, an erroneous definition of robbery; and that the trial court erred in instructing the jury relative to murder in the perpetration, or attempted perpetration, of a robbery, since there was no evidence of a robbery or an attempted robbery.

The immediate thrust now considered is a challenge to the admissibility of appellant's confession or statement that he intended to rob the officer. We have held many times that an extrajudicial confession of guilt by an accused person, standing alone, is insufficient to sustain a conviction of guilt. *Cooper v. State,* 220 Md. 183, and cases cited therein; *Pierce v. State,* 227 Md. 221. And such a confession is not admissible into evidence unless there is independent evidence, direct or circumstantial, to establish the *corpus delicti.* This is because the triers of fact in a criminal prosecution must be convinced of guilt be-

yond a reasonable doubt, and an extrajudicial confession, with-out proof of the *corpus delicti,* is insufficient, as a matter of law, to establish guilt beyond a reasonable doubt. The salutary purpose of this rule is to protect the administration of criminal justice against errors of convictions based upon untrue confessions alone. *Williams v. State,* 214 Md. 143.

But the sufficiency of the independent proof of the *corpus delicti* to permit the admission into evidence of statements or confessions made by an accused is to be determined by the facts and circumstances of each particular case. *Keyes v. State,* 236 Md. 74. Such proof need not be full and positive, and it may be circumstantial in nature, when direct evidence is not available. *Cooper v. State, supra; Cooper v. State,* 205 Md. 162, *cert. den.* 348 U.S. 896 (a different case from the first *Cooper* cited). And it need not establish, by itself, the truth of the *corpus delicti* beyond a reasonable doubt or by a preponderance of proof, but any facts and circumstances that are substantial in nature and fortify the truth of the confession or statement are sufficient to render the confession or statement (if voluntarily made, etc.) admissible. *Cooper v. State, supra,* 220 Md. 183; *Bollinger v. State,* 208 Md. 298. Cf. *Pierce v. State, supra.* We think the facts and circumstances as we stated them above (without repeating them here) were certainly substantial in nature and fortified appellant's statements that he did not intend to be locked up and he had determined, by the use of his pistol, to take the officer's gun, keys and motor vehicle so that he could "get away in a car" and "have a 15 to 20 minute start on him before *anybody* [emphasis ours] knew who they were looking for." This latter statement, alone, carries a clear implication that the officer was to be left in at least an unconscious state. We hold that the confessions (or statements) relative to his intent to rob the officer were not inadmissible on the ground here assigned.

Before closing out the consideration of this question, we note that appellant claims that if a confession is accepted as evidence, credence must be given to its entire contents. This is not the law. The law, briefly stated, is that if a confession be admissible, the accused may insist upon it being offered in its entirety, and not simply selected portions thereof; but, after it has

once been admitted, the weight to be given the several parts thereof, inculpatory and exculpatory, is for the triers of the facts to determine. *Williams v. State,* 205 Md. 470.

During the course of the detailed, able, and very fair instructions to the jury, Judge Digges stated:

> "Also, as I have indicated to you, any killing committed in the perpetration or an attempt to perpertrate a robbery is murder in the first degree. Robbery may be defined as the felonious taking and carrying away of the personal property of another from his person or in his presence by the use of violence or by putting him in fear. The crime, however, is not committed unless there is an intention to deprive the owner permanently of his property or the property of another lawfully in his possession. The crime of robbery is not committed if the intent be merely to use it temporarily and then return it. However, the Court advises you *that there exists no defense to the crime of robbery if the assailant intended to take the property, use it temporarily, and then destroy or discard the same and not affirmatively return it or provide for its return to the owner or the person in whose possession he found it."* (Emphasis added.)

It is the italicized portion to which the appellant specifically objects. He argues that this instruction informed the jury it could find that the defendant was perpetrating or attempting to perpetrate a robbery even though he did not intend "to permanently deprive the owner or lawful possessor of his ownership or lawful possession." With this contention, we are unable to agree.

We have definitely held that larcenous intent is an essential ingredient of robbery, *Midgett v. State, supra,* and we have no desire to recede from that position. This simply means that the robber must intend to steal the property taken, *i.e.,* permanently to deprive the owner (or the lawful possessor) of his property. *Midgett v. State, supra; Hochheimer, Criminal Law* (2nd ed.), § 370; 77 C.J.S., *Robbery,* § 22.

In the instant case, the last part of the last sentence of the

challenged instruction may be somewhat inarticulate in form, but we are unable to ascribe to it the same meaning given to it by the appellant. (Of course, one of the principal reasons for permitting the use of oral advisory instructions by Maryland Rule 756 was to do away with the precise and technical standards formerly required in individual written instructions, and permit a consideration of the instructions taken as a whole.) Considering only the portion of the instructions quoted above as a whole, it will be noted that the jury was informed that in order to constitute robbery there must be a "felonious taking and carrying away of the personal property of another"; that robbery "is not committed unless there is an intention to deprive the owner *permanently* (italics added) of his property"; that robbery "is not committed if the intent be merely to use it temporarily and then return it." When construed with these admonitions, the last sentence, we think, instructed the jury, in effect, that if the appellant intended to take the officer's personal property, to use it temporarily, and then to destroy or discard the same (for example by throwing it in a large body of water) so as permanently to deprive the officer of his property, then this intent was sufficient to constitute the intent necessary in robbery. And the last portion of the sentence "and not affirmatively return it or provide for its return to the owner" (still construing the quoted portion as a whole) did not inform the jury that the appellant, in order to relieve himself of a larcenous intent, had to have formulated a prior intention to return, or provide for the return of, the property; but this language was used in contradistinction from an intent to "destroy or discard" the property (and thereby permanently deprive the officer of his property as we pointed out above), which immediately preceded it. The instruction did not, we think, mislead or confuse the jury, and, as interpreted above, it was a correct exposition of the law, for the crucial element of larcenous intent is an intent permanently to deprive the owner of his property, not an intent that the thief will permanently use it himself, as is shown by the many cases in which the thief sells the property stolen. Of course, the final determination of what appellant's intent actually was was for the jury after due consideration of his words, acts and conduct. *Midgett v. State,*

*supra,* a case where the facts were quite similar to those here involved.

What has been said above and what we will say below relative to the admissibility of appellant's statements answers his contention that there was no evidence upon which to base an instruction relative to a possible robbery-murder.

### (b)

It is difficult to state with precision the exact contention here. It seems to be a claim that appellant's physical condition at the time of his making the statements was such that "he could not affirmatively waive his right to remain silent," and, under the attendant circumstances, the statements should not have been admitted, because he had no lawyer when he made them.

It will be noted that no attack is made here, nor was there any below, upon the voluntary nature of the statements. No claim is made that anyone exerted any physical, mental, or psychological duress or coercion upon him to induce him to make any of them. His claim is simply that the evidence showed his physical condition to be such that any statements made by him must be determined to be involuntary. No citation of authority is made to support this proposition, nor would the facts, as adduced herein, support such a holding.

Appellant made statements on three occasions between about 7:00 and 9:00 p.m. on the day Officer Steinat was shot. One was a spontaneous utterance made upon the arrival of the Rescue Squad. No one, up to that time, had mentioned the death of the officer. The next statement was made to State Trooper Gibson in the presence of the ambulance crew. Everyone who heard the statement testified it was volunteered by the appellant without inducement of any nature, and there was no contradiction thereof. The third was made in the presence of county police officers and an agent of the F.B.I. while on the way to Seat Pleasant. Even though he was admonished not to make a statement and informed that if he did it could be used in court against him, appellant repeated his earlier statements and in more detailed form.

There was testimony, as we set it forth above, as to what different witnesses thought appellant's physical condition was at,

and shortly after, the time he entered the ambulance. There was also clear and convincing evidence from which the trial court, in the first instance, when it was considering the admissibility, *vel non,* of the statements, and the jury, when it was considering whether the statements had been freely and voluntarily made, and if so, the weight to give them, could have determined that appellant was functioning well mentally and in full possession of his faculties, both before and after his surrender. Because he was afraid of being shot by the police for shooting one of their members, he planned and executed his surrender carefully to avoid initial contact with the police. After arranging for a call to the Rescue Squad, he carried on a normal conversation until the Squad's arrival. When he gave himself up to the ambulance crew, he was articulate and clever in pretending that he needed hospitalization. The statements themselves were clear and lucid, and were corroborated, in large part, by the other evidence, Dr. Kehoe, who examined appellant at 10:00 p.m., some one hour after his last statement, said he was in good physical condition and mentally alert. In determining what *weight* to give to a statement (or confession) made by an accused, the jury may consider the physical condition of the accused and the circumstances under which it was made, but the critical test in determining its *admissibility* is whether the disclosure was made freely and voluntarily, and at a time when the accused knew and understood what he was saying. *Wiggins v. State,* 235 Md. 97; *Bryant v. State,* 229 Md. 531; *Mefford and Blackburn v. State,* 235 Md. 497, *cert. den.* 380 U.S. 937.

Appellant also urges that his statements should not have been admitted because he was not represented by counsel when the statements were made, citing *Escobedo v. Illinois,* 378 U.S. 478. We see no analogy in the facts of this case and *Escobedo.* It would serve no helpful purpose to analyse the holding in *Escobedo,* for the Court so recently did so in quite some detail in *Mefford and Blackburn, supra.* See also *McCoy v. State,* 236 Md. 632; *Bichell v. State,* 235 Md. 395; *Sturgis v. State,* 235 Md. 343. Cf. *Thiess v. State,* 235 Md. 541. In this case, there was no request to call counsel, no denial of the right to see counsel, the statements were all made within a period of some two hours, and, among the other facts mentioned above, the police

cautioned appellant—in fact they almost demanded that he not make the third statement—that he did not have to say anything, and, if he did, it could be used against him.[1] We hold that the confessions were given under circumstances that warranted (indeed, if they did not impel) a finding that they were freely and voluntarily made; hence they were properly admitted.

## V

We finally reach the last contention of appellant. He claims that the court committed prejudicial error in refusing to instruct the jury that he was illegally arrested. We do not find the alleged error reserved in the record. However, there is no evidence that appellant was ever arrested: he did not say he was, and the only other person present at the time the officer stopped him was the deceased officer. In addition, there was evidence that appellant was driving, after dark, with only one headlight on, and appellant admitted he was driving without an operator's permit, which fact was made known to the officer. These were misdemeanors committed in the presence of the officer, either of which would have authorized appellant's arrest (if there had been one). We repeat that all of the court's instructions to the jury were very fair, and add, that the portion thereof which dealt with illegal arrest, was, under the prevailing circumstances, quite liberal.

*Judgment and sentence affirmed.*

---

**1.** Should we hold Escobedo apposite here, it would be bringing into reality the prophecy of the lawyer who, shortly after the rendition of that decision, said: "It will not be long before a person, anticipating the perpetration of a robbery, can call up a judge and say, 'I am about to commit robbery. I demand that you appoint a lawyer to accompany me, so that he will be present at every critical stage of the proceedings.'"