ROBERT LAMONT BRYANT AND CLEVELAND HAM,
JR. *v.* STATE OF MARYLAND

|No. 1610, September Term, 1980.|

*Decided July 8, 1981.*

The cause was argued before GILBERT, C. J., and THOMPSON
and LOWE, JJ.

*Arthur A. DeLano, Jr., Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellants.

*Philip M. Andrews, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, Sandra A. O'Connor, State's Attorney for Baltimore County,* and *Dennis C. Whelley, Assistant State's Attorney for Baltimore County,* on the brief, for appellee.

GILBERT, C. J., delivered the opinion of the Court.

## I.

## —THE LAW—

The road to a civilized society leads past the use of the "rubber hose," the "rack," the "Chinese boot," and other "third degree"[1] methods of obtaining "confessions" from persons accused of the commission of criminal acts.

Although there may be some remote areas of the country where the "third degree" is still occasionally practiced, it is safe to state that as a general rule the physical abuse aspect of interrogation has been brought to a halt. For discussion of what constitutes an interrogation, *see Rhode Island v. Innes,* 446 U.S. 291, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980).

The Supreme Court of the United States, in a series of cases, *Escobedo v. Illinois,* 378 U.S. 478, 84 S. Ct. 1758, 12 L. Ed. 2d 977 (1964); *Leyra v. Denno,* 347 U.S. 556, 74 S. Ct. 716, 98 L. Ed. 2d 948 (1954); *Malinski v. New York,* 324 U.S. 401, 65 S. Ct. 781, 89 L. Ed. 1029 (1945); *Ashcraft v. Tennessee,* 322 U.S. 143, 64 S. Ct. 921, 88 L. Ed. 1192 (1944); *Ward v. Texas,* 316 U.S. 547, 62 S. Ct. 1139, 86 L. Ed. 1663 (1942); *Vernon v. Alabama,* 313 U.S. 547, 61 S. Ct. 1092, 85 L. Ed. 1513 (1941); *White v. Texas,* 310 U.S. 530, 60 S. Ct. 1032, 84 L. Ed. 1342 (1940); *Canty v. Alabama,* 309 U.S. 629,

---

1. The term "third degree" came into our language in the 1890's. Stuart B. Flexner, *Hear America Talking* 275 (1976).

60 S. Ct. 612, 84 L. Ed. 988 (1940); *Chambers v. Florida,* 309 U.S. 227, 60 S. Ct. 472, 84 L. Ed. 716 (1940); *Brown v. Mississippi,* 297 U.S. 278, 56 S. Ct. 461, 80 L. Ed. 682 (1936), culminating in the landmark decision of *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), has nullified the legality of confessions obtained through duress, whether physical or mental.

In *Miranda,* the Court, speaking through Chief Justice Warren, said: " 'Since *Chambers v. Florida,* 309 U.S. 227, this Court has recognized that coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition.' *Blackburn v. Alabama,* 361 U.S. 199, 206, [80 S. Ct. 274, 279, 4 L. Ed. 2d 242, 247] (1960)." 384 U.S. at 448, 86 S. Ct. at 1614, 16 L. Ed. 2d at 709.

The Court observed that "[i]nterrogation still takes place in privacy" and that "[p]rivacy results in secrecy," which leaves "a gap in our knowledge as to what in fact goes on in the interrogation rooms." *Id.* In order to minimize the loss of knowledge as to what occurs during the privacy of custodial questioning, while simultaneously assuring, insofar as possible, that any confession is actually voluntary, the Chief Justice, for the Court, spelled out a litany to be read to each arrestee, suspect, or accused before interrogation is commenced.[2]

*Miranda* mandates that:

> "[W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege, and unless other fully effective means are adopted to notify the per-

---

2. The Court did not proclaim that the written document containing the *Miranda* warnings and the waiver of those rights be *signed* by the arrestee, suspect, or accused before a statement can be admitted into evidence. The better practice for the police, however, is, when possible, to obtain such a written waiver.

son of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." (Footnote omitted). *Id.* at 478-79, 86 S. Ct. at 1630, 16 L. Ed. 2d at 726.

Chief Justice Warren made clear that "[t]he requirement of warnings and waiver of rights is fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation." *Id.* at 476, 86 S. Ct. at 1629, 16 L. Ed. 2d at 725.

Dire consequences were predicted by some law enforcement officers as a result of what they saw as the unwarranted shackles placed upon them by *Miranda.* Confessions, it was said, would be virtually eliminated. Nevertheless, we have found no statistics indicating that *Miranda* has reduced the number of confessions, nor do we perceive that it has unduly hampered the police.

The end of what has been styled "the Warren Court" and the beginning of what is now known as "the Burger Court" gave rise to widespread speculation that *Miranda* would be short-lived. Indeed, in holdings such as *Harris v. New York,* 401 U.S. 222, 91 S. Ct. 643, 28 L. Ed. 2d 1 (1971), the Court seemed to chip away at *Miranda* and to be fashioning a coffin

for *Miranda's* ultimate demise as a viable constitutional force. *Miranda* critics, and they were numerous, thought that "the outlook was extremely rocky for the . . . [*Miranda*] nine."[3] It was just a matter of time, they said, until the "right" case would be heard by the Supreme Court and *Miranda* would be unlamented past history.

Those prognosticators of *Miranda's* expiration must have sustained an intellectual jolt when the Court filed *Edwards v. Arizona,* 49 U.S.L.W. 4496 (filed May 18, 1981).[4]

In that case, Edwards was arrested by Arizona authorities for robbery, burglary, and first degree murder. He was furnished with the *Miranda* warnings and agreed "to submit to questioning." He was "told that another suspect already in custody had implicated him in the crime[.] Edwards denied involvement and gave a taped statement presenting an alibi defense." *Id.* Later, Edwards "sought 'to make a deal.'" Following an attempt to reach the county attorney on the telephone, Edwards exclaimed, "*'I want an attorney before making a deal.'* At that point, questioning ceased and Edwards was taken to county jail." *Id.*

The next morning, two other police officers, who were colleagues of the officer that attempted to interrogate Edwards the night before, went to the jail to see Edwards. Edwards replied that he did not want to speak to them. A guard told him that "'he had'" to talk to the officers. The officers identified themselves to Edwards and informed him again of his *Miranda* rights. Edwards then made an inculpatory statement.

Prior to trial, Edwards moved to suppress the statement and the trial court granted the motion. Arizona, unlike

---

**3.** With an apology to Ernest Lawrence Thayer and his immortal, *Casey at the Bat.*

**4.** The opinion in *Edwards* was written by Justice White. Chief Justice Burger filed a concurring opinion on the judgment. Justice Powell concurred in the result, and Justice Rehnquist joined in that concurrence. The other five justices were aligned with Justice White, who interestingly, dissented in *Miranda. See* 384 U.S. at 526-45, 86 S. Ct. at 1655-64, 16 L. Ed. 2d at 753-64.

Maryland, permits the State to appeal adverse suppression rulings. On appeal, the Supreme Court of Arizona reversed.[5]

*Edwards* makes explicit what *Miranda* made implicit, and that is, *when an accused, arrestee, or suspect invokes his constitutional right to have counsel present during any custodial interrogation, all questioning must cease.*

The Supreme Court said:

> "[A]lthough we have held that after initially being advised of his *Miranda* rights, the accused may himself validly waive his rights and respond to interrogation, *see North Carolina v. Butler, . . .* [441 U.S. 369, 99 S. Ct. 1755, 60 L.Ed. 2d 286 (1979)], the Court has strongly indicated that additional safeguards are necessary when the accused asks for counsel; and *we now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights.* We further hold that an accused such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police." (Footnote omitted.) (Emphasis supplied.) *Id.* at 4497-98.

*Miranda* made crystalline that an accused, arrestee, or suspect was entitled to counsel at any custodial interrogation, unless he or she made a knowing and intelligent waiver of that constitutionally guaranteed individual right.

---

5. The facts are taken from the opinion of Justice White in *Edwards.* That opinion, in footnote 1, explains that Justice White, in turn, took the facts from the opinion of the Supreme Court of Arizona.

We read *Edwards* as laying to rest all speculation that *Miranda* is dead or dying. On the contrary, *Edwards* makes pellucid that *Miranda* is alive and well.

*Edwards* does not, in our view, expand upon *Miranda's* breadth but, rather, serves to underscore that when an accused, arrestee, or suspect, at any custodial questioning, demands his right to have counsel present, *all* interrogation must at that point cease until counsel for the accused, arrestee, or suspect is present. Once the right to the presence of counsel has been invoked, the authorities may not thereafter, directly or indirectly, initiate another attempt at interrogation until and unless counsel for the accused, arrestee, or suspect is present.

*Edwards* makes perspicuous that notwithstanding the prior invocation of the *Miranda* tenet of the right to the presence of counsel, the accused, arrestee, or suspect may validly waive that right provided the accused, arrestee, or suspect, himself, initiates "further communication, exchanges or conversations with the police." *Id. See also North Carolina v. Butler,* 441 U.S. 369, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979). The burden of showing a waiver of *Miranda* rights rests on the prosecution. "[A] valid waiver of . . . [the right to counsel] cannot be established by showing only that . . . [the accused, arrestee, or suspect] responded to further police-initiated custodial interrogation even if he has been advised of his rights." (Footnote omitted.) *Edwards v. Arizona, supra* at 4498.

We think it transpicuous that efforts by law enforcement officers to induce an ensuing waiver of the right to the presence of counsel cannot and will not be tolerated. Violation of *Miranda-Edwards* will lead to the suppression of any evidence obtained in contravention thereof, except as may be permitted by *Harris v. New York, supra.* We point out that the bounds of both the Fifth Amendment and Article 22 of the Maryland Declaration of Rights are exactly the same as those of the conduct they seek to prevent. Attempts to manipulate the mental process of the accused, arrestee, or suspect in order to "psych" him or her into changing his or her mind about the presence of counsel are just as

devastating to individual rights as is the use of the "rubber hose." The only difference between the two types of coercion is the matter of the degree of the duress.

We emphasize, even at the expense of redundancy, that *Miranda* and *Edwards* mean exactly what they say: once the accused requests the presence of counsel at a custodial interrogation, the Fifth Amendment to the Constitution of the United States of America and Article 22 of the Maryland Declaration of Rights are *ipso facto* invoked, and *all questioning must cease.*

Previously, in *Wantland v. State,* 45 Md. App. 527, 535, 413 A.2d 1376, 1381 (1980), *cert. denied,* 288 Md. 745 (filed September 4, 1980), *cert. granted and judgment vacated, case remanded for reconsideration in the light of Edwards v. Arizona, supra,* 29 Cr. L. 3074 (1981), we said:

> "[A]n accused may decline to rely upon the safeguards afforded by the Fifth and Sixth Amendments. Consequently, the police may interrogate him. When that is alleged to be the situation, '[a] heavy burden rests upon the ... [State] to demonstrate that the defendant knowingly and intelligently waived his privilege[s]. ...' *Miranda, supra* at 475, 86 S. Ct. at 1628, 16 L. Ed. 2d at 724. 'The courts must presume that a defendant not waive his rights; [so that] the prosecution's burden [of showing a waiver] is great. ...' *North Carolina v. Butler,* 441 U.S. 369, 373, 99 S. Ct. 1755, 1757, 60 L. Ed. 2d 286, 292 (1979). *See also Tague v. Louisiana,* 444 U.S. 469, 100 S. Ct. 652, 62 L. Ed. 2d 622 (1980). Waiver is not a matter of form, but rather one of fact weighed in the light of the totality of the circumstances. *Fare v. Michael C.,* 442 U.S. 707, 99 S. Ct. 2560, 61 L. Ed. 2d 197 (1979). *See also North Carolina v. Butler, supra.*
>
> At any suppression hearing, the State must carry the onus of establishing by a preponderance of the evidence that the waiver was voluntary, knowing, and intelligent. *Lego v. Twomey,* ... [404 U.S. 477,

92 S. Ct. 619, 30 L. Ed. 2d 618 (1972)]; *Mulligan v. State, . . .* [18 Md. App. 588, 308 A.2d 418 (1973)].

We again caution that once the right to the presence of counsel has been made by the accused, arrestee, or suspect, any attempt by the authorities to "spark" the accused's "own initiative" will contaminate the waiver and render it a nullity. A valid waiver of *Miranda — Edwards* is the root of all admissible confessions or other inculpatory statements.

## II.

## —THE INSTANT CASE—

### A.

Against the *Miranda — Edwards* backdrop, we consider the appeal of Robert Lamont Bryant and Cleveland Ham, Jr.

The appellants were convicted by a jury in the Circuit Court for Baltimore County of rape, perverted practices, burglary, and theft.[6]

The victim testified that she was alone in the apartment of her boyfriend, Jerome Weaver, when she heard someone banging on the door. She looked through the peephole in the door and saw one short man and two taller men standing in the hallway. The shorter man stated that he was looking for a box which was located on a table in the apartment. After receiving assurances that she was in no danger, the victim unlocked the upper of two locks on the door. At that point, one of the men pushed the door in, knocking her against the wall. The victim said that the shorter man hit her in the face and forced her into a bedroom where he raped her. According to the woman, she was raped repeatedly by each of the men and forced to perform fellatio upon them. The men, who had been wearing nylon stocking masks when they entered the apartment, later removed them.

---

**6.** *See* Md. Ann. Code art. 27, § 342.

When the culprits left the apartment, they carried away a television set, as well as stereo equipment.

Approximately twenty minutes after that point, the victim noticed police officers outside the apartment. She signaled to them for help. On direct examination, the witness told the jury that she had never seen her assailants before the incident. On cross-examination, however, she admitted having seen one of them, the appellant, Ham, shooting dice with her boyfriend earlier that same evening.

Ham testified in his own defense that he, Bryant, and another person had gone to the apartment of Weaver in order to settle a score with Weaver, who had won Ham's paycheck in the "crap game." Weaver, Ham said, used "loaded dice." Ham further testified that he had sexual relations with the victim, but he had done so with her express consent.

Admitted into evidence, over objection, were partially inculpatory statements made by both appellants during the time that they were detained by police. A third assailant, not a party to this appeal, also made a statement to the officers.

On appeal, Bryant has raised the argument that his statement was taken in violation of *Miranda.* Both appellants contend that the trial court committed other reversible errors. We shall discuss Bryant's individual argument first.

B.

The record shows that a pre-trial suppression hearing was held on the question of the admissibility *vel non* of Bryant's statement. The testimony of Ham and Bryant differed markedly from that of Officer Michael DiPaula.

DiPaula testified that on the day of the arrest, he read Bryant the *Miranda* warnings. DiPaula further stated that Bryant indicated that he wanted a lawyer to be present. Interrogation immediately ceased. Bryant and Officer DiPaula, however, remained in a detention room while DiPaula took care of some preliminary procedural matters

involving Bryant. Meanwhile, Ham was in the same room and was busy writing out a statement for the police.

DiPaula admitted telling Bryant that the two accomplices were making statements implicating Bryant. DiPaula further admitted to taking Bryant across the hall to a room where the third accomplice was engaged in making a statement. Bryant still declined to make a statement. Officer DiPaula testified that he phoned the public defender's office so as to obtain an attorney for Bryant, but no attorneys were available at that time, as all public defenders were out on other assignments. He was additionally informed that he would be put into a cell until a lawyer could be contacted. At that point, Bryant decided that he also would make a statement. Prior to the actual making of the statement, Officer DiPaula again read to Bryant the *Miranda* warnings.

The trial judge said, with respect to the issue of voluntariness:

"I find that he [Officer DiPaula] did not, in fact, say that it would be better for . . . [Bryant] to sign the statement. . . . All he did say was that the other two were signing a statement, and then when the prisoner said, 'Well, I still don't want to sign one unless an attorney is present,' the officer said, 'That's all right. It's within your rights. You don't have to sign one.'

The evidence is that then later, five minutes later, the prisoner waived his rights to remain silent which he had asserted twice. He decided he would write a statement anyway. . . .

. . .

. . . Well, the law is as I gathered from arguments and as I remember from my own reading of it, that a person who has a Constitutional right to have a lawyer present, and that a person also has the capacity if he is compos mentis, understanding what he is doing, to waive that Constitutional right just as he has the capacity to waive his Constitutional right to a jury trial after once

electing to be tried by a jury. And that being the law, I find that having twice asked for an attorney, and the third time having said, well, I'm ready to write a statement without an attorney, that his Constitutional rights are not violated when the officer then takes the statement instead of waiting till the attorney arrives. Under the circumstances present as is revealed by the testimony, I find that the Motion to Suppress ought to be denied. Therefore, I deny the Motion to Suppress."

The judge was mistaken for the reasons we have stated *ante* in Part I.

When Bryant exercised his right to have counsel present, all interrogation should have ceased. Instead, it was continued by the officer's using the ploy of keeping him in the same room with Ham, while Ham wrote a statement and also of taking Bryant into a room where the other accused was making a statement. Such action on the part of the police was obviously calculated to underpin the detective's statement to Bryant that the accomplices had confessed.

Patently, the detective was endeavoring to cause Bryant to retreat from the *Miranda* fortress and to surrender his will to the officer because the battle was lost anyhow. It is precisely that type of "persuasion," duress, coercion, or intimidation that is forbidden by *Miranda* and *Edwards.*

The statement of Bryant should have been suppressed. Therefore, we shall reverse Bryant's conviction and remand his case for a new trial.

## C.

Bryant and Ham argue that the evidence was insufficient to sustain the convictions inasmuch as the victim consented to the sexual act. The victim, however, said that she was ravished and forced to commit the perverted acts. The jury obviously believed the victim and not the defendants.

The credibility of the witness is a matter for the trier of fact to weigh and determine. *Barnes v. State,* 31 Md. App.

25, 354 A.2d 499 (1976). We cannot say that they were wrong in the conclusion they drew from the testimony and from the assessment of credibility. The jury was not required to believe Ham's exculpatory statement. *Wilson v. State,* 7 Md. App. 41, 253 A.2d 439 (1969).

Appellants contend that because the victim made contradictory statements with respect to whether she had ever seen the appellant, Ham, before the incident, her testimony is unbelievable. *See Bailey v. State,* 16 Md. App. 83, 294 A.2d 123 (1972). The law, however, is that if the jury believed the victim, as it obviously did, it could reasonably find, beyond a reasonable doubt, that the appellants were guilty. *Jackson v. Virginia,* 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). *Mitchell v. State,* 44 Md. App. 451, 409 A.2d 260 (1979).

## D.

Lastly, we reject appellants' allegation that the trial judge erred in not permitting Ham to testify under the "state of mind" exception to the hearsay rule to statements supposedly made by the victim's boyfriend to Ham shortly after the incident. Appellants aver that such testimony would have bolstered their contention that there had been no rape, and that the injuries to the victim were the result of her having been beaten by her boyfriend when he returned to the apartment.

Hearsay utterances are permitted into evidence for the purpose of showing the state of mind of the out-of-court declarant, and not for the truth of the statement offered. 6 *Wigmore on Evidence* § 1790 (rev. ed. 1976).

The offered testimony was irrelevant. If the appellants desired to establish that the victim's "boyfriend" was the

person who "beat" her, then they should have summoned the "boyfriend" and obtained his sworn testimony.

> *Judgments as to the appellant, Bryant, reversed, and case remanded for a new trial.*
>
> *Costs not to be allocated.*
>
> *Md. Rule 1082f.*
>
> *Judgments as to the appellant, Ham, affirmed.*
>
> *One-half of the costs to be paid by appellant Ham.*