# DIANE MARIE SOUFFIE v. STATE OF MARYLAND

[No. 577, September Term, 1981.]

*Decided January 11, 1982.*

The cause was argued before Lowe, Couch and Bishop, JJ.

*Edward F. Houff,* with whom was *Alfred L. Scanlan, Jr., Assigned Public Defender,* on the brief, for appellant.

*Ann E. Singleton, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, Paul S. Podolak, State's Attorney for Cecil County,* and *John L. Scarborough, Assistant State's Attorney for Cecil County,* on the brief, for appellee.

Lowe, J., delivered the opinion of the Court.

Diane Marie Souffie was convicted by a jury in the Circuit Court for Caroline County of second degree murder, robbery, robbery with a deadly weapon, use of a handgun in the commission of a felony, and battery. She was found not guilty of felony murder, assault and transporting a handgun. Because the jury could not agree on first degree murder, the trial judge declared a "mistrial" as to that count. The victim was a young man who (while driving a van) picked up appellant and her friend Pamela Brooks, with whom appellant was hitchhiking. The three became better acquainted during

their rambling wanderlust when appellant and the victim had sexual intercourse in the back of the van; but their relationship deteriorated after appellant and her friend each shot the victim in the head with a derringer carried by Brooks. Appellant takes issue with the State's contention that the intercourse was consensual and the murder motivated by robbery, arguing that the content of one of her statements to the police generated a self-defense issue because she indicated that she had shot the victim after he had raped her.

I

Predominant and preliminary among the eleven issues raised by appellant is the admissibility of the pretrial statements which she made to the police in the early morning hours following her arrest. She contends that there was no probable cause for her arrest, after which the statements were elicited (see *Ryon v. State,* 29 Md. App. 62, 71-72 (1975), *aff'd,* 278 Md. 302 (1976)), and that the statements were taken in violation of her *Miranda* [1] rights as explicated in *Rhode Island v. Innis,* 446 U.S. 291 (1980) and in *Bryant v. State,* 49 Md. App. 272 (1981).

Because our independent review of the record satisfies us that the police had abundant, if not overwhelming, probable cause to obtain the warrant for the arrest of appellant, we need not address the criteria of admissibility set forth in *Ryon, supra,* for a statement given while in custody as the result of an improper arrest. During our extensive review, however, we were assured that even those criteria would have been satisfied had the State lacked probable cause to arrest. The quantity of information contained in the record is so extensive that to set it out in what will be an overly long opinion would distract from the impact of the narrower legal issues raised by appellant and serve no purpose sufficient to offset that distraction.

The second half of the bifurcated confession-suppression issue is one recently addressed by the Supreme Court, the Court of Appeals and ourselves. Seemingly, such architects would provide a carefully constructed legal foundation; but

1. Miranda v. Arizona, 384 U.S. 436 (1966).

regrettably, we have left cracks in the floor which must be filled or fallen through on a case by case basis. *Vines v. State,* 285 Md. 369, 376 (1979). Perhaps because the appellate courts (including the Supreme Court) have been so involved with the judicial dissection and legal definition of a single *Miranda* sentence, we sometimes overlook the fact that before the legal formulae can be applied, a factual determination must be provided against which the formulae may be used as a measure. Because even a single witness's testimony may be subject to different interpretations, appellate judges must defer to their trial level brethren whose determinations arise from personal observations, voice inflections, nuances and physical reactions to examination and cross-examination.

Thus, when determining on appeal whether the facts constitute a custodial interrogation, we must accept the trial judge's conclusions unless the record indicates a clear interpretive error. Md. Rule 1086. An example of such clear error was manifest in *Bryant v. State, supra,* although we addressed the error there . as indicative of a legal misunderstanding by the trial judge, rather than a clearly erroneous factual determination. Despite a "markedly" different version of what occurred as related by appellants in that case, *id.* at 281, we looked only at the officer's testimony (most favorable to the State) and still found his conduct — however one interpreted his testimony — to have been an interrogative "ploy". *Id.* at 283.

> "When Bryant exercised his right to have counsel present, all interrogation should have ceased. Instead, it was continued by the officer's using the ploy of keeping him in the same room with [codefendant] Ham, while Ham wrote a statement and also of taking Bryant into a room where the other accused was making a statement. Such action on the part of the police was obviously calculated to underpin the detective's statement to Bryant that the accomplices had confessed.
>
> Patently, the detective was endeavoring to cause Bryant to retreat from the *Miranda* fortress and to

surrender his will to the officer because the battle was lost anyhow. It is precisely that type of 'persuasion,' duress, coercion, or intimidation that is forbidden by *Miranda* and *Edwards* [*v. Arizona,* 451 U.S. 477, 68 L.Ed.2d 378 (1981)]."

—the first statement —

Appellant in this case attempts to draw a factual analogy with *Bryant,* hoping to obtain a similar result. Between her arrest and her first statement, however, she was admittedly provided repeated *Miranda* warnings. She did not invoke a right to counsel nor did she indicate a desire to remain silent. On the contrary, according to the testimony of Trooper Samuel Pierce, which appellant summarizes in her brief, she

> "indicated she would like to tell what happened, however, she had been talking with Mr. Ball's attorney, Gene Herman, and he advised her that she didn't have to talk if she didn't want to." [2]

Appellant was arrested at the residence of Robert Ball, whose attorney she telephoned before she was taken to the police station. The attorney, Gene Herman, offered the above gratuitous advice even before the police did so in a more formal manner. The attorney subsequently called the police station and explained to Trooper Pierce that he would not be able to represent appellant because he was a friend of the victim's family.

Because of appellant's ambivalence between her desire to speak and Herman's advice, the officer informed her of Herman's call and explained that "she would have to take the advice he gave her as just that, advice, and that the final decision whether or not to speak with us still rested with her." [3]

---

**2.** That advice was, of course, part of the same advice just read to her by the police as a *Miranda* warning.

**3.** Appellant emphasized at argument that a subsequent reference to this episode on cross-examination elicited the response that:

Trooper Pierce further stated that:

"After that, I just left her with that thought and continued on explaining, in detail the charges and the status of the investigation we had developed, who the information had come from, the implications that were laid out in the statements from Brooks, Randall Brooks and Bill Campbell."

---

"I told her that she had to realize that the advice of an attorney or the advice of Mr. Herman was just that, advice, and that the final decision to talk to us or not was her final decision."

Obviously, when viewed in light of the prior testimony, the officer inferably slipped by referring to "an" attorney and corrected that with the use of the conjunctive "or" to indicate that his statement to appellant was restricted colloquially to Herman, rather than applicable to any attorney. The cross-examination, taken in its context, also indicated that clear interpretation.

"Q Well, when she told — in other words, she told you, when you read her her rights, that she had talked to a lawyer and that lawyer had told her she didn't have to say anything, is that correct?
A That's correct.
Q And did she tell you that she wanted to go along with that?
A She told me that she wanted to tell me her version.
Q That was before, but then she told you, you said that she had talked to a lawyer and that her lawyer had explained to her that she didn't have to say anything?
A That Mr. Herman had explained to her —
Q That's correct, who is a lawyer.
A Who is a lawyer here in Elkton.
Q And when she said that, that her lawyer had told her that she didn't have to say anything, are you sure she didn't say he told her not to say anything?
A No, sir, I'm sure.
Q Okay. When she said he told her she didn't have to say anything, what exactly did you say?
A I told her that she had to realize that the advice of an attorney or the advice of Mr. Herman was just that, advice, and that the final decision to talk to us or not was her final decision.
Q In other words, you wanted her to, you wanted her to talk about it, isn't that correct?
A Yes, sir.
Q In spite of a lawyer telling her she didn't have to talk. You definitely wanted her to talk?
A I wanted her to make up her own mind.
Q Well, you wanted her to make up her own mind because you knew that you have a possibility of her talking if she made up her own mind, isn't that correct?
A Yes, sir.
Q Why didn't you just drop off when you heard, when she stated that she had talked to a lawyer, who advised her not to say anything? Why didn't you stop with the questioning right there?
A Because she didn't indicate she wanted to stop."

Those implications must have been disconcerting. Appellant became nauseous, hurried to the bathroom and returned fifteen minutes later, at which time she "blurted" (according to the State) that "she had been with the Waddell boy, or with the boy, and that he had raped her and that she had shot him."

Appellant's reliance upon *Bryant* (which relied upon *Edwards v. Arizona, supra*) is totally misplaced. Both *Bryant* and *Edwards* relate to who instituted a reinterrogation after the fifth amendment right identified in *Miranda* (to have counsel present at any custodial interrogation) had been invoked. *Rhode Island v. Innis, supra,* also mentioned in *Bryant,* is somewhat more on target, but that, too, misses the mark. *Innis* dealt with what *Miranda* meant by "interrogation", or its "functional equivalent" which may consist of any "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301. *See generally Leuschner v. State,* 49 Md. App. 490 (1981).

But it does not appear at that juncture of this case, that it was yet necessary to decide who had initiated a phase of an interrogation *(Edwards)* or even if there was an interrogation *(Innis)*. Both of these refinements presuppose that an individual has indicated in some manner, at some time prior to or during questioning, that she wished to remain silent, at least until she was provided counsel. It is only then that an interrogation must cease. *Miranda, supra* at 473-474. At no time prior to her first statement did appellant, in any manner, indicate her desire to remain silent. At best she equivocated, explaining her ambivalence because of the advice of her affectionado's attorney. The questioning officer appears to have taken her remark not as a request that the interrogation cease, but merely as a passing comment. See, *e.g., Frazier v. Cupp,* 394 U.S. 731, 739 (1969). The information conveyed regarding his representative status and the admonition that appellant must herself decide whether to speak did not convert the subsequent remarks into a "product of compulsion, subtle or otherwise", such as to overcome

her "free choice", in producing a statement even if "the privilege [to remain silent] ha[d] been once invoked." *Miranda, supra* at 473-474; and see *Frazier, supra* at 739. The officer testified that she had not only indicated a desire to tell what happened, but he further stated that if she had ever told him that she did not want to talk to him, the interview would have ended. She did not contradict that — she did not even testify at the suppression hearing. The officer is undoubtedly whom the judge believed and with nothing to weigh against that testimony, we cannot say that the judge was in error.

Absent an invocation of the *Miranda* rights, we must determine, however, whether appellant had waived them, since there was no express written or spoken waiver. While we are admonished in *Miranda* that waiver may not be presumed from a silent record, *id.* at 475, after more than a decade of experience, the Supreme Court has explained that the heavy burden of proving waiver need not be restricted to an express waiver by a defendant but may be inferred from the evidence of the circumstances of the interrogation. In *North Carolina v. Butler,* 441 U.S. 369 (1979), the Court said:

"That [waiver may not be inferred by a silent record] does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights. The courts must presume that a defendant did not waive his rights; the prosecution's burden is great; but in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated." *Id.* at 373.

See also *Leuschner v. State,* 45 Md. App. 323, 329, *cert. denied,* 288 Md. 738 (1980), *vacated,* 451 U.S. 1014, 69 L.Ed.2d 385 (1981).

Here the uncontradicted facts show that appellant indicated a desire to give a statement, hesitating only because of advice by one who was not — and declined to become — her lawyer.

"Q Well, when she told — in other words, she told you, when you read her her rights, that she had talked to a lawyer and that lawyer had told her she didn't have to say anything, is that correct?

A That's correct.

Q And did she tell you that she wanted to go along with that?

A She told me she wanted to tell me her version."

That the officer, at this preliminary stage of arrest, continued to explain the nature of the charges and the basis for her arrest is not, under the circumstances, indicative of an interrogation. The officer left the accused with the thought that she must decide whether to waive or invoke the *Miranda* rights. She was then provided the opportunity to leave the room, presumably to recover from a wave of nausea and to reflect upon her dilemma. Upon her return, without urging or solicitation by the officer, she immediately and voluntarily issued the first oral statement. Here, as in *Butler* and *Leuschner,* both *supra,* the words and actions of the appellant clearly implied a knowing and intelligent waiver of the rights of which she was admittedly advised.

— the second, more damning, statement —

It is factually significant, we believe, that following this "blurted" first statement, appellant was visited briefly by her codefendant, Pamela Brooks, after which appellant asked, and was permitted, to return to the detention cell and rest. After about an hour the officer went to appellant's cell and asked if she was ready to "continue" her statement. She indicated that she was, and the officer repeated the *Miranda* warnings. Twenty minutes later as the officer again repeated the *Miranda* warnings, appellant indicated that she did not want to make any statement "at this time", saying "I'm confused at the moment. I want some time to think about it." The officer terminated his questioning of her immediately and returned her to the detention cell again, providing her the time requested "to think". While this con-

duct gave credence to the officer's former declaration that he would have terminated his questioning if appellant had so indicated, what subsequently transpired again raises the ghost of *Innis* and *Edwards.*

After allowing appellant about an hour's contemplation, at about 5:30 a.m., the officer decided to process appellant for transfer to the county jail. During the course of processing, the officer told her that Brooks had made a statement resulting in Brooks' charges having been reduced to obstruction of justice. He also told appellant that Brooks had implicated her in the murder and that appellant was "the only person being charged with first degree murder." Appellant became "rather angry" and, stating that she wanted to give a statement, she again asked for time "to get her thoughts together". The officer returned her to her cell where she remained for approximately forty-five minutes.

At about 6:30 a.m. the officer again brought appellant out of the cell and asked if she was ready to give the statement. She replied in the affirmative, was again read her *Miranda* rights and replied:

> "I want to tell you what happened. I don't want you writing anything. I just want to tell you what happened."

Appellant did just that for approximately an hour and a half. The officer once again repeated the *Miranda* warnings (for at least the fifth time), after which appellant gave him a written statement.

In her brief, appellant is primarily preoccupied with whether the information given to her by the officer about Brooks' alleged "deal," which elicited the second statement, was an "interrogation" as defined by *Innis.* Because that interrogative device receives frequent use among investigators, it should be addressed. It is not altogether dispositive, however, because this argument also presupposes an invocation of the right to remain silent or to have counsel present.

The officer's recitation obviously was intended to elicit

whatever facts could be jarred loose by a codefendant's apparent cop-out in exchange for leniency. After already having outlined the status of the case and the basis for the charge upon arrest, surely no factfinder, however naive, could believe that a police officer discloses step-by-step investigatory matter discovered in a murder case to a suspect beneficently to encourage her to decide to invoke her *Miranda* rights, as conversation for the amusement of the accused, or even as casual gossip. The purpose was to "induce disclosures" and no other inference is reasonably suggested. In fact, the very contrary is reflected in the accused's transcribed statement, which the recital elicited.

> "Q. Why did you decide to tell this to Trooper Pierce?
>
> A. Because after asking him questions it seemed like it couldn't get any worse. Just being quiet wouldn't help any everybody else was giving statements. It seemed only fair that I tell my side of it."

We have addressed this issue because the attorney general reminds us of our prior discussions of the same practice in *Leuschner v. State,* 41 Md. App. 423, *cert. denied,* 444 U.S. 933 (1979); *Vines v. State,* 40 Md. App. 658 (1978), *aff'd,* 288 Md. 361 (1979); *Cummings v. State,* 27 Md. App. 361, *cert. denied,* 276 Md. 740 (1975); *Howell v. State,* 5 Md. App. 337 (1968), *cert. denied,* 253 Md. 734, *cert. denied,* 396 U.S. 907 (1969). Each of these cases involved statements or conduct of the police conveyed to the accused with the apparent, if not obvious, purpose of showing the futility of continued silence *after* a *Miranda* election was conveyed to the police. In each there is a holding or expression that:

> "Appellant's response to such police information was not the product of an interrogation, either direct or subtle, but was more in the nature of volunteered information." *Howell, supra* at 338-339.

In *Howell,* the accused was informed that the person accused

with him had admitted Howell's participation in the burglary. In *Fellows,* appellant was told that his statement did not coincide with other police information; we cited *Howell* for the principle that the accused's response that "[t]his time I'll tell you the truth" was not the product of interrogation either subtle or direct, but more in the nature of volunteered information. In *Cummings,* the accused did not inculpate himself in direct response to formal questions but "gratuitously" offered an inculpatory parting comment after signing a more innocuous formal statement. There too, we relied on *Howell* (among others), for the proposition that the response was in the nature of volunteered information. Similarly in *Humphrey v. State,* 39 Md. App. 484, 491, *cert. denied,* 283 Md. 733 (1978), which was not included in the attorney general's list, we held that a police officer telling an accused that he had "just found the gun" after the accused had invoked his right to silence was not an interrogation. Then, in *Vines* we stretched the *Howell* philosophy a little farther, holding that a police officer's exhibition of contraband seized from appellant's house did not constitute an interrogation, despite the officer's admission that it was intended to invoke an incriminating response. *Id.* at 668-669, Lowe, J., dissenting.

When the Court of Appeals reviewed *Vines v. State* in 285 Md. 369 (1979), it elected to address the question as "psychological coercion," treating it primarily as a fourth amendment issue of voluntariness in the traditional sense. It did not avoid the *Miranda* (fifth amendment) question entirely, however, holding,

> "that in the circumstances of this case, there was no 'interrogation' within the meaning of *Miranda* to invoke its application." *Id.* at 382.

Significantly, none of these cases were addressed in the light of *Rhode Island v. Innis,* 446 U.S. 291 (1980), which had not yet been decided.

*Innis* exclusively addressed interrogation as conceptualized in *Miranda* explaining that

> " 'Interrogation', as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself."

But that non sequitur helps very little. In fact when viewed against the case's conclusion, it adds to our quandary rather than to our elucidation. Between that platitude and the peculiar reŝult in *Innis,* however, the Court did provide some helpful guidelines which may be summarized in a single sentence from that case.

> "We conclude that the *Miranda* safeguards come into play whenever a person in custody is subject to either express questioning or its functional equivalent." *Id.* at 300-301.

Prong one — express questioning — is self-evident, and not the problem we presently face. The only "express questioning" ("are you ready to continue with your statement") was ended promptly whenever appellant indicated, albeit equivocally and temporarily, that she wished to terminate the inquiry. The applicable issue here is whether the officer's narrative concerning Pamela Brooks was the "functional equivalent" of an interrogation.

The Supreme Court explained that the "functional equivalent" of an interrogation was

> "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301.

Cautioning that police surely cannot be held accountable for the *unforeseen* results of their interrogations, the Court made clear its holding that:

> "A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation." *Id.*

Although *Innis* suggests that we focus primarily upon the perceptions of the suspect to make that determination, it acknowledges the relevancy of police interest as well.

"In Brewer v Williams, 430 US 387, 398-399, 51 L Ed 2d 424, 97 S Ct 1232, the Court applied the 'deliberately elicited' standard in determining that statements were extracted from Williams in violation of his Sixth Amendment right to counsel. Although this case involves Fifth Amendment rights and the Miranda rules designed to safeguard those rights, respondent's invocation of his right to counsel makes the two cases indistinguishable. In both cases the police had an unqualified obligation to refrain from trying to elicit a response from the suspect in the absence of his attorney. See Kamisar, Brewer v. Williams, Massiah, and Miranda: What is 'Interrogation'? When Does it Matter?, 67 Geo LJ 1, 73 (1978)." *Innis, supra* at 310, n. 7, (Stevens, J., dissenting).

That footnote alone may well have altered the result in *Vines, supra,* but no admission of purpose or motive was admitted here by the police as was so in *Vines.* What other purpose can there be for such a narrative addressed to a suspect than to elicit a response by using that emotional impetus? It is impossible to draw any conclusion as to purpose other than that which was effected.

But the use of an emotional impetus was not banned by *Innis.* Quite to the contrary, the Court carved out an exception to the "functional equivalent" of interrogation definition it had created that involved even more of a stimulus than an "emotional impetus", which it denominated "subtle compulsion". In *Innis,* "subtle compulsion" was used by the police to locate a sawed-off shotgun used in a robbery committed by a suspect they had just apprehended in the vicinity of a school for handicapped children. The accused had invoked his rights to both silence and counsel, so the two police officers driving past the school talked "back and forth"

to each other (rather than to the accused directly) regarding the possibility that:

> "God forbid, one of them might find a weapon with shells. . . ."
> "He [Gleckman] said it would be too bad if the little — I believe he said a girl — would pick up the gun, maybe kill herself." *Id.* at 294-295.

So emotionally motivated did the accused, who obviously overheard all of this, become that he directed the police to the robbery (and prior murder) weapon because he "wanted to get the gun out of the way because of the kids in the area of the school." *Id.* at 295.

> "Thus, it may be said, as the Rhode Island Supreme Court did say, that the respondent was subjected to 'subtle compulsion'. But that is not the end of the inquiry. It must also be established that a suspect's incriminating response was the product of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response. This was not established in the present case." *Id.* at 303 (footnote omitted).

As inconceivable as it may seem in light of its own analysis, the Supreme Court affirmed the trial judge's opinion that the police neither knew nor should have known that the colloquy was reasonably likely "to elicit an incriminating response." [4]

We have no difficulty in seeing the narrative here as a "subtle" psychological attempt to elicit a confession, just as we did in *Bryant* following *Innis* and *Edwards*. The officer either knew or should have known that his conduct and conversation were reasonably likely to elicit an incriminating response. It was pointedly so intended. The result in *Innis* we find to be an aberration rather than an

---

4. The only logical explanation of the *Innis* result is that deference should be given to the factfinder when the knowledge issue is a reasonably close one. The trial judge had ruled in favor of admission. The Rhode Island appellate court had reversed.

exception to the rule it stands for; but even if it is intended to carve some sort of exception to the "functional equivalent" definition, the statements that actually elicited the response in this case, unlike *Innis*,[5] were addressed directly to the appellant. It would appear, therefore, under the circumstances in this case, that the statements elicited were the product of a custodial interrogation, the trial judge did not address that issue when ruling upon the admissibility of the statements.[6]

"But", in the language of the Supreme Court, "that is not the end of the inquiry". Both parties have argued on the presupposed premise that appellant had properly invoked a constitutional right shielding her from any further inquiry. The appellant's broad side attack claims that

"Each Of Appellant's Statements Was Obtained Through Interrogation, And In Violation Of Her Fifth And Sixth Amendment Rights."

We have previously held that appellant did not at any time invoke her fifth amendment right identified in *Miranda* to have counsel present at any interrogation, which we assume appellant alludes to as her sixth amendment right. The record is also wanting in evidence of a violation of her fifth amendment right to remain silent, even to the limited extent that she invoked that right. Parenthetically we note that appellant at argument conceded that an accused could be reinterrogated upon a qualified invocation of *Miranda*, provided the qualifying conditions have been met. She did not concede that the conditions precedent to reinterrogation had been met. The record does not bear out her latter position.

---

5. As pointed out by Mr. Justice Marshall's dissent in *Innis, supra* at 306:

"If the statements [by the police officers] had been addressed to respondent, it would be impossible to draw such a conclusion.",

*i.e.,* that the colloquy was not intended, nor might have been repeated, to elicit a response from the accused.

6. We encourage trial judges to address all issues requiring the finding of fact under the circumstances of each case, especially such as determining whether words or conduct should have been expected to evoke a response from an accused.

In her brief appellant pointed step-by-step to every conceivable invocation of her fifth amendment right to silence. Upon each occasion that appellant invoked her fifth amendment right, she qualified it. She asked for and received permission to lie down and rest. She wanted and received "some time to think" because she was confused. When she became "rather angry" at the Brooks narrative, she expressed the desire to give a statement "after she had some time to get her thoughts together." Not having admonished the officer that she would call him (rather than he call her), she was given approximately an hour's respite on each occasion, to rest, to think, and to get her thoughts together. On each occasion she was asked if she was ready and then reminded of her right to "remain" silent, as well as her right to have counsel present, but never did she indicate such a desire. Nor did she ever contradict her initial expression that she *did* wish to give a statement. It is, therefore, insignificant that the statements she gave were a product of custodial interrogation. She did not indicate "in any manner, at any time prior to, or during, questioning, that [s]he wish[ed] to remain silent . . . ." *Miranda, supra* at 474 (emphasis added). The statements were properly elicited and properly admitted, absent a *Miranda* invocation.

## II

Secondly, appellant contends that because her first statement which was admitted as evidence indicated

"[t]hat . . . she had been raped by the . . . young man that [the police] indicated she had murdered,"

the judge erred by not instructing the jury on the issue of self-defense. She adds that:

"By failing to give the instruction on self-defense, the trial Judge not only prejudicially deprived the Appellant of an argument before the jury, but also essentially directed the jury's attention to the sec-

ond statement and tacitly instructed them that the first statement was a lie."

The short answer to that complaint is that one does not defend oneself *from* a rape by killing the rapist *after* the act has been perpetrated. II Wharton's *Criminal Law* § 127 (14th ed. 1979). The argument may give rise to an issue of mitigation in the nature of justifiable homicide to prevent the rape; perhaps even diminished responsibility after the act (but see *Simmons v. State,* 292 Md. 478 (No. *55,* September Term, 1931, filed January 7, 1982), but the right of self-defense does not extend to punishment or revenge for an act already perpetrated. *State v. Sorrentino,* 224 P. 420 (Wyo. 1924); *State v. Nodine,* 259 P.2d 1056, 1070 (Or. 1953); *State v. Winsett,* 205 A.2d 510, 518 (Del. 1964); *People v. Thornton,* 186 N.E.2d 239, 241 (Ill. 1962). The appellant did not generate an issue of self-defense sufficient to warrant an instruction thereon. *Street v. State,* 26 Md. App. 336, 338-341, *cert. denied,* 275 Md. 756 (1975).

### III

Appellant's third contention, that the instructions on robbery were confusing and in error, was not preserved for review pursuant to the requirements of Md. Rule 757 f.

### IV

Appellant complains that her convictions of robbery and robbery with a deadly weapon were inconsistent with the jury's verdict of not guilty of felony murder. Because the Court of Appeals has held that a conviction on one count need not be vacated because of an inconsistent not guilty verdict on another count, we need not further address the issue of consistency. *Ford v. State,* 274 Md. 546, 552 (1975).

### V

Appellant contends that the trial court erred by failing to

request the jury to specify the crime in which it found appellant guilty of having used a handgun. Appellant erred, however, in failing to preserve this issue for appeal by a timely objection to the instructions, Md. Rule 757 f, or to the verdict when rendered.

## VI

The jury convicted appellant of robbery as well as robbery with a deadly weapon. Arguing merger, appellant cites *Jones v. State,* 3 Md. App. 608, 613-614, *cert. denied,* (1968) 251 Md. 750, 394 U.S. 993 (1969), as authority for the proposition that the crimes are duplicative, arguing that the latter merely provides an enhanced sentence for an aggravated commission of the former. The State cites *Rose v. State,* 37 Md. App. 388, 393, *cert. denied,* 281 Md. 743 (1977), and *Towers v. Director,* 16 Md. App. 678, 682-683 (1973), as authority for our declining to review this issue as not having been preserved by objection at sentencing. Appellant replies that neither case stands for the principle espoused.

We note, however, that in *Brown v. State,* 8 Md. App. 462, 468 (1970), we said:

"We have in the past, as we do here, taken cognizance of merger of offenses when the question was raised on appeal even though not raised below. We did so to establish clearly the doctrine of merger to be applied in this jurisdiction. We think it has now been clearly established and point out that we shall be more inclined to invoke Md. Rule 1085 in this regard in the future." *Id.* at 468.

*Rose* suggested that where sentences were consecutive we should decide the merger question whether preserved or not, to avoid manifest injustice. *Rose, supra* at 394. The pertinent sentences here were concurrent, but since the record reveals that the judge decided the issue, and the State concedes the decision was error, we will strike the robbery sentence and merge the robbery conviction with that of armed robbery.

## VII

The same issue is raised and the same reply is made by the State as to failure to merge battery and murder. For the reasons expressed in *Brown, supra,* we normally would not address this issue on appeal, since again appellant did not object timely. Although the judge discussed merger generally, it seems clear that his remarks were addressed to the robbery-armed robbery issue above decided. Nor did the judge take appellant off the hook by deciding this question. Our reflections in *Rose* would not apply since the sentences were concurrent here also; however, the State at argument again conceded the merger error as an obvious one. We can hardly permit two convictions to stand for a single crime in the face of such concession. We will merge the battery with the murder.

## VIII

Appellant complains that the trial judge erroneously declared a mistrial of first degree murder when the jury reported that it was "unable to agree" on that count. We will not decide the propriety of that declaration because to do so is to provide an advisory opinion. Unless appellant is retried for that offense, the issue will be moot. If she is retried, she may have the issue decided promptly on a double jeopardy contention from which she may propitiously appeal an adverse ruling, if such should be the case.

## IX

Citing three references to the transcript appellant asks:

> "Did the trial judge err to appellant's substantial prejudice by permitting irrelevant and improper evidence of appellant's sexual activity to be presented to the jury?"

Appellant's first objection was belatedly made after an affirmative answer was given to a question whether the witness

Campbell had ever slept with the appellant. The objection was made on the ground of relevancy. Since the witness was testifying to highly inculpating disclosures appellant had made to him, the intimacy of their relationship was clearly relevant to establish the credibility of his testimony. That she had confided in him became more probable than it would have been without the evidence.

Furthermore, in light of appellant's confessions, we also find it relevant to support the conduct admitted to by appellant's second confession, which was on its face incredible for a human female, if not for the species arachnid.[7] The more mitigating first confession referred to the later admitted consensual sex acts as a "rape". Her attitude regarding sex was, therefore, relevant to support the more callous version of premeditated malice as opposed to the mitigatory hot-blooded purpose of revenge for rape.

It is also worthy of note that appellant has addressed these evidentiary references to her conduct as "evidence of the commission of other crimes by the accused merely to show the accused's criminal tendency or disposition." We are not aware that fornication is criminal conduct or indicative of a criminal disposition. While chastity is still considered by many as a virtue, if the contemporarily popular sexual poll takers are to be believed, many more do not consider fornication a sin. It is certain that the Legislature has not considered it a crime. We are, therefore, only concerned with the relevancy of the question as it related to the witness and to the crime, since this is not a "prosecution for commission of rape . . .", in which like evidence is made inadmissible by statute. Md. Code Ann. (1976 Repl. Vol., 1981 Supp.), Art. 27, § 461A.

While appellant points out that the judge later sustained an objection regarding the relevancy of whether she had

---

7. The black widow spider is reputed to destroy and consume its male mate after he has served his reproductive purpose.

Not only did appellant admit having destroyed the victim by whom she had just been serviced, she threatened this witness with a similar demise if he testified, despite their prior sexual relationship as well.

ever *told* the witness with whom she had had sexual relations, this does nothing to change our view. That question too may have been "relevant" but was more remote in that it asked what was *told* the witness rather than what the witness knew. The judge's rulings were perhaps inconsistent, however, neither were reversible error.

Nor was the third complaint, that the same witness was permitted to answer a question indicating that appellant had driven without a license. While the relevance of that question is thin, we think its admissibility was not indicative of an abuse of the judge's discretion in that regard. Appellant's confession had inferentially indicated that she had driven the victim's van. The question anticipated and dispelled the likelihood of her denying that corroborative evidence by Campbell by an assertion that she wasn't even licensed to drive. Even if on balance that purpose weighed lightly upon the scale of probative value, its prejudicial effect was even less. See *Cross v. State,* 282 Md. 468, 474 (1978); *Mollar v. State,* 25 Md. App. 291, *cert. denied,* 275 Md. 753 (1975). There was no prejudicial error.

Appellant's further complaint that the prosecutor argued improperly by referring to appellant's "lifestyle" derogatorily was not preserved by objection.

X

Appellant asks next:

"Must appellant's convictions be reversed because of the prosecutor's extreme and prejudicial references to his personal belief in appellant's guilt?"

In *Williams* and *Sneed v. State,* 50 Md. App. 255 (No. 360, September Term, 1981, filed December 4, 1981), we pointed out that although it may be improper for a prosecutor to assert his personal belief or personal conviction as to the guilt of the accused, such assertions are precluded only

"if that belief or conviction is predicated upon anything other than the evidence in the case." *Riggins v. State,* 125 Md. 165, 174 (1915).

See also Code of Professional Responsibility, DR 7-106 (C) (4). The prosecutor's allusions here were expressly related to the evidence in the case.

## XI

Finally, appellant complains about the accomplice instruction, which definitively included an accessory before the fact as one who might be an accomplice. Appellant predicates a lengthy argument upon the fact that because:

"The Maryland statute under which Appellant was convicted of second degree murder does not make an accessory a principal [citations omitted] . . . in order to convict Appellant of second degree murder as an accessory, the State had to obtain an indictment which specifically charged appellant as an accessory."

What appellant (as well as the State) overlooked was that she was charged as an accessory before the fact. As pointed out in *State v. Williamson,* 282 Md. 100 (1978), the statutory short form of indictment for murder, Md. Code Ann. (1976 Repl. Vol., 1981 Supp.) Art. 27, § 616, applies to murder, manslaughter, or "for being an accessory thereto." See also *State v. Ward,* 284 Md. 189, 200 (1978). It follows not only that the reference to an accessory in the accomplice instruction was perfectly proper under the indictment and (we add parenthetically) under the evidence as well.

> *Judgments as to robbery and battery vacated; all other judgments affirmed.*
> *Costs to be paid by appellant.*