RAYMOND OFFUTT a/k/a Raymond Latour
Williamson *v.* STATE OF MARYLAND

[No. 840, September Term, 1982.]

*Decided July 7, 1983.*

The cause was argued before MOYLAN and BISHOP, JJ., and CHARLES E. ORTH, JR., Associate Judge of the Court of Appeals (retired), specially assigned.

*Louis P. Willemin, Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Diane G. Goldsmith, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, Andrew L. Sonner, State's Attorney for Montgomery County,* and *Martha Kavanaugh, Assistant State's Attorney for Montgomery County,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

The appellant, Raymond Offutt, a/k/a Raymond Latour Williamson, was convicted by a Montgomery County jury, presided over by Judge Rosalyn B. Bell, of theft. Upon this appeal, he raises three contentions:

(1) That the evidence was not legally sufficient to sustain the conviction;
(2) That Judge Bell erred in permitting the introduction of his statement in edited form; and
(3) That Judge Bell erred in failing to suppress the statement on constitutional grounds.

On August 10, 1981, the home of Sheriff John Gue was broken into at some time between 8:40 a.m. and 5:20 p.m. Among the items stolen was a Browning over-and-under shotgun, valued at somewhere between $1,500 and $4,000. After the police recovered the shotgun, Sheriff Gue identified it as being the one stolen. The barrel of the gun, however, had been shortened from 28 inches to 13 inches since its disappearance.

On August 18, eight days after the housebreaking, Detective Slavin executed a search and seizure warrant at

12630 Viers Mill Road, Apartment 805. In the closet of the master bedroom, occupied by the appellant, Detective Slavin found the sawed-off shotgun. He also found a hacksaw in that same closet.

The official lessee of the apartment was Ms. Johnny Joppy. She testified that the appellant lived there with her between April, 1981 and his arrest on August 18, 1981. His belongings had been moved to the apartment and his clothes were in the closet in the master bedroom, where the shotgun and hacksaw were found. The appellant had keys to the apartment. The records of the Department of Transportation listed the appellant's address as 12630 Viers Mill Road, Apartment 805. Ms. Joppy denied all knowledge of the existence of the shotgun.

## Legal Sufficiency of the Evidence

The appellant acknowledges, as he must, that the stolen gun was found in Apartment 805, which he occupied with his live-in companion, Ms. Johnny Joppy. He seeks solace from the fact that the stolen gun was not in his exclusive possession but, at worst, in the joint possession of him and Ms. Joppy. *Sutton v. State,* 8 Md.App. 285, 259 A.2d 561 (1969), upon which he relies, does not afford him such solace. *Sutton* provides that joint possession does not negate the notion of exclusive possession as that term is used in reference to the permitted inference that may be drawn from such possession. In the *Sutton* case, four separate persons were found in joint possession of stolen property, and the permitted inference of theft (and even of burglary) was permitted to flow from that recent and joint "exclusive possession." *Sutton* pointed out, at 8 Md.App. 297:

"In the instant case all four appellants are found in the joint possession of stolen merchandise approximately two hours after the time of the crime. This fact alone sufficiently supports the convictions of all appellants because the recent exclusive possession of stolen goods permits a rational

inference of fact that they were the thieves or the burglars. *McGlothlin v. State,* 1 Md. App. 256, 229 A.2d 428, *Anglin v. State,* 1 Md.App. 85, 227 A.2d 364. Indeed they could have each been convicted of both charges since there was no merger."

It is equally clear that the evidence with respect to the appellant's residence in the apartment (including keeping his clothes there, having his own keys, using it as his address of record with the Department of Transportation and sleeping in the very master bedroom wherein the stolen gun was found) was a legally sufficient predicate for a jury finding that he was, at the least, in joint possession of the stolen gun. With respect to such joint possession, we reasoned in *Folk v. State,* 11 Md.App. 508, 518, 275 A.2d 184 (1971):

"The common thread running through all of these cases affirming joint possession is 1) proximity between the defendant and the [stolen property], 2) the fact that the [stolen property] was within the view or otherwise within the knowledge of the defendant, 3) ownership or some possessory right in the premises or the automobile in which the [stolen property] is found, or 4) the presence of circumstances from which a reasonable inference could be drawn that the defendant was participating with others in the mutual use and enjoyment of the [stolen property]."

The evidence was legally sufficient to support the finding of guilt in two separate ways. The law is settled that at least two separate permitted inferences may follow from the predicate fact of possession of recently stolen goods. The Court of Appeals pointed out in *Brewer v. Mele,* 267 Md. 437, 449, 298 A.2d 156 (1972):

"We have long and consistently held that exclusive possession of recently stolen goods, absent a satisfactory explanation, permits the drawing of an inference of fact strong enough to sustain a con-

viction that the possessor was the thief . . .; or, under appropriate circumstances, that the possessor was a receiver of stolen goods . . .; or, where the theft was compounded, that the possessor was also the burglar . . . or the robber." (Citations omitted).

In the present case, the evidence was, therefore, legally sufficient to support a jury finding that the appellant was the thief within the contemplation of the common law of larceny. That is now one of the forms of criminal conduct rendering him eligible for conviction under Maryland's new Consolidated Theft Statute. Art. 27, § 342 (a) provides:

"A person commits the offense of theft when he willfully or knowingly obtains control which is unauthorized or exerts control which is unauthorized over property of the owner, and [has the requisite intent]."

In the alternative, the evidence was also legally sufficient to support a jury finding that the appellant was a receiver of stolen goods within the contemplation of the common law of receiving. That is also now one of the alternative forms of criminal conduct rendering him eligible for conviction under Maryland's new Consolidated Theft Statute. Art. 27, § 342 (c) provides:

"A person commits the offense of theft if he possesses stolen personal property knowing that it has been stolen, or believing that it has probably been stolen, and [has the requisite intent]."

## The Editing of the Statement

It strikes us as with extreme ill grace that the appellant pushes his second contention. When the apartment which the appellant shared was searched, stolen goods were recovered that implicated the appellant in a large number of burglaries and housebreakings. At least five other burglaries and housebreakings were involved, in addition to the one

now in issue. On August 19, 1981, the appellant gave Detective Bendl a long and rambling statement, explaining how he came into possession of many items of stolen property and protesting that, although he may have been a receiver of stolen goods, he was not the thief. One reference among the many was to the stolen shotgun which was the sole object of the theft case now before us.

In an effort to sanitize the statement in this case, there was meticulously culled out all reference to all stolen property other than the shotgun and all reference to other burglaries or housebreakings. Indeed, it would have been improper to have tarnished the appellant in this case with admissions as to other crimes. *Cross v. State,* 282 Md. 468, 386 A.2d 757 (1978); *Ross v. State,* 276 Md. 664, 350 A.2d 680 (1976). The editing of a statement in the fashion done in this case is not only permitted but strongly recommended. *Bell v. State,* 234 Md. 254, 258, 198 A.2d 895 (1964). The edited admission that was introduced into evidence was as follows:

> "I didn't steal any of that property. I was holding property for some people. I'll tell my lawyer about everything. I saw him sawing off the shotgun. I'll accept the receiving charge but no burglary charge."

The appellant now claims that the truncated statement was improperly received because the editing distorted its meaning. He argues that his words, "I'll accept the receiving charge but no burglary charge," may refer to some other item of stolen property and not the shotgun. Our observation is that the admission followed immediately on the heels of the preceding sentence, "I saw him sawing off the shotgun," and clearly refers to it. We simply do not see the distortion the appellant claims and cannot believe that the deletion of reference to other crimes did not work to his unquestioned benefit.

The appellant's reliance upon *Hadder v. State,* 238 Md. 341, 209 A.2d 70 (1965), and *Williams v. State,* 205 Md. 470,

109 A.2d 89 (1954), is totally misplaced. The appellant relies specifically on the following passage from *Hadder,* at 238 Md. 353-354:

> "The law, briefly stated, is that if a confession be admissible, the accused may insist upon it being offered in its entirety, and not simply selected portions thereof; but, after it has once been admitted, the weight to be given the several parts thereof, inculpatory and exculpatory, is for the triers of the facts to determine."

The short answer to the contention is that the appellant simply did not request that the entire statement be introduced in unedited form. It would have been an absurdly self-destructive thing to do, but he could have done it. He rather took the editing as an accepted starting point and argued from it that the statement, as then distorted, should not have been introduced at all in edited or unedited form. *Hadder* and *Williams* do not stand for any such ridiculous proposition.

What was done here was for the unquestioned benefit of the appellant and worked to the unquestioned benefit of the appellant. His protest, under the circumstances, falls on unreceptive ears.

## *The Admissibility of the Statement*

The key contention raised by the appellant is that the brief admission excised from the long and rambling statement should not have been received in evidence because it violated his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966), as interpreted by *Edwards v. Arizona,* 451 U.S. 477, 101 S. Ct. 1880, 68 L.Ed.2d 378 (1981). We do not agree. Indeed, we find the factual situation at bar to be one which is clearly controlled by *Michigan v. Mosley,* 423 U.S. 96, 96 S. Ct. 321, 46 L.Ed.2d 313 (1975), rather than by *Edwards v. Arizona.*

*Edwards v. Arizona* drew a qualitative distinction between the two rights of a suspect which *Miranda* seeks to protect — the right to silence and the right to an attorney. The distinction deals with the manner in which those respective rights may be waived. The waiver of the right to silence is judged by traditional voluntariness standards, that once controlled confession law generally and still control the voluntariness of a consensual search. 451 U.S. at 482-484; *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

The waiver of the right to counsel, on the other hand, has traditionally been determined by the *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), standard of "a knowing and intelligent relinquishment or abandonment of a known right or privilege." 451 U.S. at 482. By way of implementing that waiver standard, *Edwards v. Arizona* went on to require that once a suspect has evidenced his desire for a lawyer, interrogation must cease and may not resume "unless the accused himself initiates further communications, exchanges, or conversations with the police." *Id.* at 485.

Maryland has dutifully followed the command of *Edwards v. Arizona. Bryant v. State,* 49 Md.App. 272, 431 A.2d 714 (1981). Although more recent interpretations have significantly mellowed the apparent initial rigor of *Edwards v. Arizona,* most especially, *Wyrick v. Fields,* U.S. , 103 S.Ct. 394, 74 L.Ed.2d 214 (1982); *Oregon v. Bradshaw,* U.S. , 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), it is still required that the suspect do something that can at least loosely be interpreted as "a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation." *Oregon v. Bradshaw, supra.*

All of this, however, whether relating to the right to silence or to the right to an attorney, has been decided within the context of a unitary investigation of a single crime or criminal episode and not in the context of separate investigations of separate crimes (and perhaps by separate teams of investigators).

It is *Michigan v. Mosley* that controls that phenomenon involving separate investigations of separate crimes. The appellant seeks to slip out from under the controlling authority of *Michigan v. Mosley* by pointing out that the specific right invoked in the initial interrogation in *Michigan v. Mosley* was only the right to silence, whereas the right invoked in the initial interrogation in this case was the more-difficult-to-waive right to counsel. That coincidentally happens to be very true, but it is not the doctrinal hinge on which *Michigan v. Mosley* pivoted. The Supreme Court did not deal with what would be required properly to resume an interrogation, following the invocation of either right, with respect to a single case but went to great lengths to point out the separate natures of the two investigations and consequently of the two interrogations.

Of critical significance was the fact that, after Mosley had invoked his right under *Miranda* in the first investigation, the different team of officers investigating the second crime scrupulously "restricted the second interrogation to a crime that had not been a subject of the earlier interrogation." 423 U.S. at 106.

The parallel between *Michigan v. Mosley* and the present case is so striking that it will be revealing to walk through their respective fact patterns side-by-side.

| *Mosley* | *Appellant* |
|---|---|

### The First Arrest

| | |
|---|---|
| On the afternoon of Day 1, Mosley was arrested for the two robberies of (1) the Blue Goose Bar and (2) the White Tower Restaurant. He was arrested on the basis of information supplied by an anonymous caller. He was taken to the robbery bureau on the fourth floor of police headquarters. | On the afternoon of Day 1, the appellant was arrested for the three housebreakings of the (1) Thrift, (2) Higgins, and (3) Beard residences. The affidavit in support of the search warrant for his apartment asserted that the fruits of these three housebreakings would be found there. He was taken to |

the Montgomery County Detention Center.

### The First investigator

The first arresting and interrogating officer was Detective Cowie, who was not involved in the subsequent investigation and interrogation.

The first arresting and interrogating officer was Detective Slavin, who was not involved in the subsequent investigation and interrogation.

### The First Interrogation

Mosley was advised of his rights under *Miranda v. Arizona.* He invoked his right to silence. All interrogation ceased. He was taken to his cell.

The appellant was advised of his rights under *Miranda v. Arizona.* He invoked his right to a lawyer. All interrogation ceased. He was taken to his cell.

### The Lead to the Second Investigation

The anonymous tip that had implicated Mosley in the first two robberies had also implicated him in the murder of one Leroy Williams, perpetrated in the course of an attempted third robbery outside the 101 Ranch Bar.

A second search of the appellant's apartment, executed with the consent of Ms. Johnny Joppy, revealed additional stolen goods which led to two additional burglary charges involving the (1) Hurd and (2) Nigen residences.

*Michigan v. Mosley* thus reveals that the subsequent investigation need not be totally unrelated to or unassisted

by the first investigation in order to be deemed "separate" within the contemplation of the *Mosley* doctrine. Indeed, the relationship between the first and second investigation was significantly less attenuated in the case of Mosley than in the case of the appellant. In *Mosley,* the same anonymous informant who gave Detective Cowie the tip as to the first two robberies also informed that same detective that Mosley was involved in the murder arising out of the attempted third robbery. Detective Cowie, in turn, informed the Homicide Bureau. In the appellant's case, the second and consensual search of the apartment revealed new evidence as to additional burglaries that the first investigator had been totally unaware of.

### The Second Investigator

The second investigating officer was Detective Hill, who had not been involved in the first arrest and interrogation.

The second investigating officer was Detective Bendl, who had not been involved in the first arrest and interrogation.

### The Lapse in Time

At shortly after 6 P.M. of Day 1, the second interrogation of Mosley took place. The lapse of time between the two interrogations was approximately two hours.

It was not until 7:55 P.M. on Day 2 that the second interrogation of the appellant took place. The lapse of time between the two interrogations was approximately 30 hours.

*The Movement in Space*

For the second interrogation, Mosley was moved to the Homicide Bureau on the fifth floor of the same police department building.

For the second interrogation, the appellant was taken from the Montgomery County Detention Center to the police station, a separate building some distance away.

*The Second Interrogation:*
*Warnings*

Mosley was advised of his rights under *Miranda v. Arizona.*

The appellant was advised of his rights under *Miranda v. Arizona.*

*The Second Interrogation:*
*Waiver*

Mosley made no affirmative waiver. The Supreme Court simply noted that "at no time during its course did Mosley ask to consult with a lawyer or indicate that he did not want to discuss the homicide." 423 U.S. at 98.

Following the *Miranda* warnings, the appellant was affirmatively asked whether he wanted an attorney and affirmatively stated that he did not.

*The Stimulus for Renewed*
*Conversation*

Mosley initially denied any involvement in the murder. The police "tricked" him by

There is a real question as to whether the appellant was ever even interrogated.

falsely informing him that a co-defendant had confessed to participating in the murder and had indicated that Mosley was the triggerman. This was completely false. Under its stimulus, however, Mosley confessed to his own complicity.

Detective Bendl simply explained to the appellant why the two additional burglary charges had been placed. He pointed to the additional stolen property and said, "That's why you're here." He asked no questions about either of those burglaries or about any other crimes. The appellant spontaneously gave a "rambling type statement," admitting receiving but denying theft or burglary. *See Souffie v. State,* 50 Md.App. 547, 555, 439 A.2d 1127 (1982).

## The Appellate Posture

The Michigan Supreme Court reversed the admissibility ruling and supporting findings of the trial judge and was, in turn, reversed by the Supreme Court of the United States.

We are affirming the admissibility ruling and supporting findings of the trial judge.

The Supreme Court has recently made clear that it strongly discountenances the overly rigid appellate scrutiny of the initial determinations of the trial judge. *Cf. Illinois v. Gates,* U.S. , 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983): "Similarly, we have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. A magistrate's 'determination of probable cause should be paid great deference by reviewing courts.' "

In totality, it is clear to us that the State's case for the admissibility of the appellant's somewhat innocuous admission about receiving stolen goods is far stronger than was Michigan's case for the admissibility of Mosley's statement admitting to first-degree murder. *A fortiori,* the affirmance of the conviction in this regard is dictated by *Michigan v. Mosley.* The Supreme Court's summary of the facts there, at 423 U.S. 104-105, reads like a mirror image of the case here:

> "After an interval of more than two hours, Mosley was questioned by another police officer at another location about an unrelated holdup murder. He was given full and complete *Miranda* warnings at the outset of the second interrogation. He was thus reminded again that he could remain silent and could consult with a lawyer, and was carefully given a full and fair opportunity to exercise these options. The subsequent questioning did not undercut Mosley's previous decision not to answer Detective Cowie's inquiries. Detective Hill did not resume the interrogation about the White Tower Restaurant robbery or inquire about the Blue Goose Bar robbery, but instead focused exclusively on the Leroy Williams homicide, a crime different in nature and in time and place of occurrence from the robberies for which Mosley had been arrested and interrogated by Detective Cowie."

Based upon those facts, which are actually not as strong a case for the State as are the facts before us, the Supreme Court had no difficulty in concluding, at 423 U.S. 105-106:

> "This is not a case, therefore, where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in

repeated efforts to wear down his resistance and make him change his mind. In contrast to such practices, the police here immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, *and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation.*" (Emphasis supplied).

We have no difficulty in reaching the same conclusion.

*Judgment affirmed.*
*Costs to be paid by appellant.*