885 A.2d 920

**Ernest James MYERS**

v.

**STATE of Maryland.**

**No. 233, Sept. Term, 2005.**

Court of Special Appeals of Maryland.

Nov. 4, 2005.

506

Paul A. Fortenberry, Bradford C. Peabody (Nancy S. Forester, on brief), Baltimore, for appellant.

Steven L. Holcomb (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Panel SALMON, EYLER, JAMES R. and MEREDITH, JJ.

EYLER, JAMES R., J.

Ernest James Myers, appellant, was convicted by a jury in the Circuit Court for Washington County of theft of property having a value of $500 or greater. The court sentenced appellant to ten years' imprisonment. On appeal, appellant challenges (1) the denial of his motion to suppress evidence based on the alleged illegality of his arrest and (2) the legal sufficiency of the evidence to sustain his conviction. As explained below, we shall affirm the ruling, on slightly different grounds than that argued by the parties, and shall affirm the judgment.

## Factual Background

The charge and conviction in this case was based on the theft of property taken on October 11, 2002, from the residence of Joseph Marinelli in Washington County.[1]

---

1. Appellant was charged with several other offenses in five other cases filed in Washington County. Appellant filed a motion to suppress

On February 12, 2003, prior to the filing of charges in Washington County, Officer Clifford Weikert, with the Carroll Valley Borough Police Department, in the Commonwealth of Pennsylvania, stopped appellant while appellant was driving a vehicle. Subsequently, Pennsylvania charged appellant with the theft of property stolen from William Welsh in Pennsylvania in October, 2001. Appellant filed a motion to suppress evidence obtained as a result of the stop of his vehicle. The Court of Common Pleas, Adams County, the trial court, denied the motion. A jury convicted appellant of theft, and appellant appealed to the Superior Court of Pennsylvania, an intermediate appellate court. The Superior Court, in an opinion dated June 7, 2004, labeled "non-precedential," reversed the trial court's ruling on the motion to suppress and "vacated" the "judgment of sentence."

The facts, in pertinent part, as set forth in the Superior Court's opinion (quoting from the trial court's opinion), are as follows.

On February 12, 2003, at approximately [6:40 p.m.], Officer Clifford Weikert of the Carroll Valley Borough Police Department, while in a marked vehicle on routine patrol, observed a red Dodge Sundance unoccupied and parked in a no-parking zone along Northern Pike Trail. As he proceeded down the roadway past the vehicle, Officer Weikert observed a black male individual wearing a dark stocking cap and dark clothing walking toward the vehicle. As Officer Weikert passed this individual, Officer Weikert observed this individual bend over and apparently cover his face from Officer Weikert's view. Alerted by these actions, Officer Weikert proceeded down the road, immediately turned his vehicle around, and returned towards the area where he observed the individual and the vehicle. As he headed toward the parked vehicle, Officer Weikert observed the red Dodge Sundance pass him at a high rate of speed. Based upon the distance between the location where Officer

---

evidence in all of the cases, asserting the same grounds as asserted herein.

Weikert initially observed [appellant], the location of the parked vehicle and the amount of time that passed while Officer Weikert turned his vehicle around, Officer Weikert opined that the individual must have sprinted to the vehicle since the time of his initial observation. When the Dodge Sundance passed the police vehicle, Officer Weikert once again turned his vehicle around in order to follow the Dodge Sundance. While following the vehicle, he estimated it was traveling at a rate of speed of 40 miles per hour in a 25 mile per hour zone.

Officer Weikert indicated that at the time he observed the individual walking along the roadway, he was aware of a description of a suspect from a February 5, 2003 incident, in which a known eyewitness described a person involved in an attempted burglary. Specifically, Officer Weikert was aware that the suspect involved in the February 5, 2003, incident was wearing charcoal gray clothing, a dark blue cap, and was a black male between 5'6" and 5'10" in height. Officer Weikert was also aware that several weeks prior to this incident there were a number of burglary or criminal trespass related incidents occurring in the Carroll Valley Borough area . . . .

. . . .

Prior to the stop of the individual's vehicle, Officer Weikert was also aware that the investigation into the criminal incidents . . . revealed that each of the incidents occurred between 6:00 p.m. and 9:00 p.m., which was a time consistent with the time of Officer Weikert's observation of the subject in dark clothing. According to Officer Weikert, the recent number of burglaries within the Carroll Valley area was excessive and unusual based upon his experience as a Carroll Valley police officer and his familiarity with the area.

. . . Officer Weikert initiated a traffic stop of the vehicle. At the time of the traffic stop, Officer Weikert observed in plain view a large screwdriver within the vehicle, which appeared to him to be consistent with a screwdriver capable

of making pry marks [similar to those] found at [the other recent burglaries]. Officer Weikert identified the driver as appellant and took him into custody on outstanding warrants from a neighboring jurisdiction. As a result of a search incident to his arrest, several items of rare United States Currency and a savings bond titled in another person's name were recovered from [his] person. The screwdriver was seized, the vehicle was impounded, and a search warrant was obtained for a search of the vehicle. During the subsequent search, a number of pieces of jewelry were found in the front console and seized as evidence.

We shall discuss the Superior Court's reasoning when we discuss the issues raised in this appeal.

### Suppression Hearing—Maryland

As earlier stated, after appellant was charged in this case, he filed a motion to suppress all evidence. At the suppression hearing, Trooper Eric Guyer, with the Pennsylvania State Police, and Investigator Greg Alton, with the Washington County Sheriff's Department, testified.

Trooper Guyer testified to the following. In September, 2002, he was assigned to the criminal investigation division and continued an investigation, begun by his predecessor, of several burglaries with similar modes of operation. In connection with that investigation, Trooper Guyer had frequent contact with Investigator Alton.

On February 12, 2003, the day of the traffic stop, Trooper Guyer went to the Carroll Valley Police Department station. At that time, Trooper Guyer became aware of evidence that had been seized from appellant and his vehicle. Trooper Guyer also interviewed appellant. Trooper Guyer contacted Investigator Alton and shared information. As a result of information obtained from the evidence seized, officers applied for and obtained search warrants, which were executed. The evidence obtained included stolen property and physical evidence connecting appellant to various crime scenes.

Investigator Alton testified that he began investigating burglaries in December 2001 and that he had identified 34 burglaries with a similar mode of operation. Prior to the traffic stop of appellant in Pennsylvania, Investigator Alton had a description of a suspect, described as a black male 5'7" or 5'8" in height. This information was made available to various police departments. Investigator Alton did not know appellant and had not identified him as a suspect. Investigator Alton was aware that the arrest of appellant on February 12, 2003, was on an outstanding arrest warrant.

Based on information obtained from the evidence seized from appellant, Investigator Alton obtained and executed search warrants in Maryland. One of the places searched was a residence located at 26 Belview Avenue in Hagerstown. During the search, the police seized stolen property, some of which had been stolen from the residence of Joseph Marinelli on October 11, 2002. The police found other items which we will discuss when we address the legal sufficiency of the evidence to sustain the conviction. The search warrants were obtained and executed prior to the Superior Court's decision.

At the suppression hearing, five search warrants were introduced into evidence as State exhibits, and the Superior Court's opinion was introduced as a court exhibit.

The circuit court denied appellant's motion to suppress. The court explained:

At the time of the vehicle stop the Defendant had an outstanding arrest warrant issued by the State of Maryland, which is not disputed. This court holds that once he was identified by the Pennsylvania authorities and confirmed that he had an outstanding warrant by a neighboring jurisdiction, he was lawfully detained. Maryland law is clear that the issue of identity discovered during an illegal detention is not subject to exclusion by the "fruit of the poisonous tree" doctrine. *Modecki v. State,* 138 Md.App. 372, 771 A.2d 521 (2001). The subsequent search and seizure of the Defendant and his vehicle pursuant to the arrest warrant, and not because of the traffic stop itself was therefore lawful.

. . . .

In the present case the Defendant neither challenged the legality of the Maryland arrest warrant nor called for its production at the suppression hearing. Therefore, the issue of the warrant not being in evidence at the suppression hearing is of no consequence.

## Trial

Joseph Marinelli testified that someone entered his home on October 11, 2002, by breaking the kitchen door. He testified that various items were taken, including three strongboxes. One contained the deed to his house and related papers. Another contained jewelry, including five watches which he valued at $1900. The third contained U.S. Savings Bonds, which he had to cash in, and by doing so, lost four thousand dollars. Mr. Marinelli described other items taken, including a credit card, a backpack, a class ring, a gold charm, and pens and pencils.

Detective Chris Kayser, with the Hagerstown Police Department, testified that he investigated the break-in at Mr. Marinelli's home. He stated that the value of items stolen, as reported by Mr. Marinelli, included a gold charm valued at $500, a high school class ring valued at $100, and a pearl tie clip valued at $500. He stated that the total loss was reported as $18,840.00. Some of the items were recovered during the search of 26 Belview Avenue.

Investigator Alton testified that he obtained a search warrant for 26 Belview Avenue and executed it on February 20, 2003. When he executed the warrant, a "teenaged female" answered the door, who contacted her mother, Michelle King Hewitt. The officer explained why he and other officers were there, and they then searched the residence. The officers recovered various items of stolen property, including property owned by Mr. Marinelli. The recovered property owned by Mr. Marinelli included a strongbox containing a deed and other papers, two watches, a backpack, and a pocketknife.

Investigator Alton testified that, in addition to stolen property, he found mail and bills addressed to appellant at 26 Belview Avenue. He also found male clothing in an upstairs bedroom.

Appellant stipulated that property that Mr. Marinelli identified as his was recovered from 26 Belview Avenue.

The jury found appellant guilty of theft and that the value of the property stolen had a value of $500 or greater.

## Contentions

### Motion to suppress

Appellant contends that Maryland courts are bound by the decision of the Pennsylvania Superior Court, holding that the traffic stop of appellant was illegal. If not binding, according to appellant, we should find that the Superior Court decision is persuasive in its analysis. Alternatively, appellant contends that, if Maryland case law governs, the traffic stop was illegal because the knowledge of the Pennsylvania police officer was legally insufficient to justify the stop.

According to appellant, because information obtained as a result of the illegal stop was tainted and included in the subsequent applications for search warrants, including the warrant for 26 Belview Avenue, the circuit court was required to cull out all tainted information and make a probable cause determination. The circuit court failed to do so.

The State contends that the Pennsylvania Superior Court decision was premised on federal constitutional law and is neither binding nor persuasive. The State further contends appellant was properly arrested on an outstanding warrant, and even if his stop and detention were unlawful, his identity discovered as a result of the stop was not "fruit of the poisonous tree" and could not be suppressed. Additionally, the State contends that the initial traffic stop was lawful as a traffic stop, under *Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), or based on reasonable articulable suspicion of criminal activity, under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Finally, the State contends that, if the stop was illegal, any taint was attenuated because Investigator Alton acted in good faith in

obtaining search warrants, the evidence seized at the time of arrest would have been inevitably discovered because of the outstanding arrest warrant, and appellant could not suppress his identity.

### Sufficiency of the evidence

Appellant was charged with theft by possession. He contends that the male clothing and mail addressed to him found at 26 Belview Avenue were legally insufficient to connect him with the stolen property. Additionally, he contends that the evidence of value of Mr. Marinelli's property found at 26 Belview Avenue was less than $500, and thus, appellant could not be convicted of felony theft.

Not surprisingly, the State contends that the evidence was legally sufficient to sustain the conviction.

### Discussion

#### Motion to suppress

#### I.

The first issue we address is whether the decision by the Pennsylvania Superior Court is binding with respect to its holding that the stop of appellant was illegal. This turns on whether the decision was premised on Pennsylvania state law or federal constitutional law. As explained in *Moore v. State,* 71 Md.App. 317, 322–323, 525 A.2d 653 (1987):

The first issue we consider is the application of the arrest jurisdiction's law to the question of probable cause. Since the arrest occurred in the District of Columbia, under the ruling in *Berigan v. State,* 2 Md.App. 666, 668, 236 A.2d 743 (1968), we apply that jurisdiction's "law" in testing the validity of the arrest. While the *Berigan* Court did not delineate what it meant when referring to the "law" of the arrest jurisdiction, the word "law" must refer to the particular statutes and constitutional provisions of that jurisdiction. Where those statutory and constitutional provisions are not in contravention of the United States Constitution, and to the extent that they expand an arrestee's rights, clearly those provisions control any decision concerning the validity

of an arrest. If the word "law" in *Berigan* meant case law interpreting federal constitutional law, under the principles of federalism, a sister state's constitutional interpretation would not necessarily be binding in this State. Where, however, that sister state's interpretation is persuasive, as was the case in *Berigan*, a Maryland court may adopt that jurisdiction's analysis.

Applying this test, we conclude that the Superior Court's decision is binding with respect to its conclusion that there was no probable cause for the stop based on a violation of motor vehicle laws but, as explained later, is not binding as to the remedy. The decision is also not binding with respect to its conclusion that there was no reasonable articulable suspicion of criminal activity.

The Superior Court observed that the prosecution offered two explanations for the stop: (1) the officer's belief that appellant was exceeding the speed limit, in violation of the motor vehicle code, and (2) the officer's belief that appellant was engaged in criminal activity. With respect to the traffic violation, the court relied primarily on *Commonwealth v. Whitmyer*, 542 Pa. 545, 668 A.2d 1113 (1995), and concluded that the officer's observation that appellant was speeding was insufficient to constitute probable cause.

In *Whitmyer*, the officer's observations were that the defendant changed lanes and drove at an unsafe speed, in excess of the speed limit. *Id.* at 1114. While the *Whitmyer* Court discusses Fourth Amendment jurisprudence, our reading of the opinion is that the court's conclusion rested on the interpretation and application of state statutes, particularly a provision that required an estimate of speed to be based on following the vehicle for at least three-tenths of a mile.[2] *See id.* at 1117. The officer had followed the defendant for two-tenths of a mile, not three-tenths as required by the statute, and there was no other evidence of a motor vehicle violation constituting probable cause for a stop. *Id.*

---

2. 75 Pa. Cons.Stat. Section 3368(a)(2002) provides: "Speedometers authorized.—The rate of speed of any vehicle may be timed on any

In 1996, subsequent to the *Whitmyer* decision, the Supreme Court decided *Whren v. United States,* holding that a police officer could stop a vehicle based on probable cause to believe that the vehicle or driver was in violation of a provision in a motor vehicle code. 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Subsequent to *Whren,* the Supreme Court of Pennsylvania decided *Commonwealth v. Gleason,* 567 Pa. 111, 785 A.2d 983, 989 (2001), reaffirming its *Whitmyer* decision.

 The Superior Court did not reference any exclusionary rule that might exist under Pennsylvania law for violation of the vehicle code. Neither did the court in the decisions that it relied upon. No such exclusionary·rule has been called to our attention, and our check has revealed none. Consequently, we conclude that the Superior Court determined that there was no valid stop under federal constitutional law[3] because .there was no probable cause for a traffic stop under Pennsylvania statutory law. Thus, the Superior Court applied the federal exclusionary rule as a remedy. That portion of the decision is not binding on us. In other words, we are bound by the portion of the decision that is based on Pennsylvania statutory law but not the remedy, *i.e.,* suppression.

---

highway by a police officer using a motor vehicle equipped with a speedometer. In ascertaining the speed of a vehicle by the use of a speedometer, the speed shall be timed for a distance of not less than three-tenths of a mile." *Whitmyer,* 668 A.2d at 1114 n. 5.

**3.** We note that Pennsylvania consistently applies federal constitutional law to determine the legality of investigatory stops by the police. As the Supreme Court of Pennsylvania has explained "Pennsylvania has always followed *Terry* in stop and frisk cases." *Commonwealth v. Jackson,* 548 Pa. 484, 698 A.2d 571, 574 (1997) (citing *Commonwealth v. Hicks,* 434 Pa. 153, 253 A.2d 276 (1969)). Thus, it follows that Pennsylvania courts look to *Whren,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89, in deciding whether a police officer had probable cause to believe that a vehicle or driver was in violation of a provision in the state motor vehicle code. If, under *Whren,* a police officer lacked probable cause to perform an investigatory stop, the federal exclusionary rule is the appropriate remedy to exclude any evidence obtained from the illegal stop.

[4] With respect to reasonable articulable suspicion of criminal activity, the Superior Court concluded that the evidence was insufficient to justify the stop. The prosecution relied on knowledge that (1) several burglaries had occurred in the weeks preceding the stop, between 6 p.m. and 9 p.m., in the general area where the officer observed appellant, and that (2) appellant matched the description of a suspect from a February 5, 2003 attempted burglary, (3) exhibited suspicious behavior as the officer approached, and (4) attempted to flee once he spotted the officer. The Superior Court observed that the physical description was "exceedingly general," the span of time of the burglaries was in fact much broader than argued, and the burglaries occurred one half mile to ten miles away and a week to a month prior to the stop. The Superior Court also found that there was insufficient evidence of flight.

In contrast to the analysis of probable cause to believe that a traffic violation had occurred, the Superior Court's conclusion that the officer lacked reasonable articulable suspicion of criminal activity appears to have been based solely on federal constitutional requirements. *See, e.g., Commonwealth v. Goodwin,* 561 Pa. 346, 750 A.2d 795, 797 (2000) ("we note that Pennsylvania has consistently followed Fourth Amendment jurisprudence in stop and frisk cases ... *Terry v. Ohio* sets forth standard for reasonableness of a search[.]"); *Commonwealth v. Lohr,* 715 A.2d 459, 461 (Pa.Super.1998) ("It is well established 'when the police stop a vehicle in this Commonwealth for investigatory purposes, the vehicle, and its occupants are considered "seized" and this seizure is subject to constitutional constraints.'") (quoting *Commonwealth v. Knotts,* 444 Pa.Super 60, 64, 663 A.2d 216 (1995)). Consequently, the Superior Court's decision on this issue is not binding on us. As explained in the next section, however, applying federal constitutional law, we come to the same conclusion on this issue as the Superior Court.[4]

---

4. We express no opinion on the validity of the stop based on whether there was probable cause to believe a traffic violation had occurred. As

## II.

 In reviewing a denial of a motion to suppress, we look only to the record of the suppression hearing, extend deference to the fact finding of the suppression judge, and accept those findings as to disputed issues of fact unless clearly erroneous. *See, e.g., Jones v. State,* 343 Md. 448, 457–58, 682 A.2d 248 (1996); *Pryor v. State,* 122 Md.App. 671, 677 n. 4, 716 A.2d 338 (1998); *Partee v. State,* 121 Md.App. 237, 244, 708 A.2d 1113 (1998). We also consider those facts that are most favorable to the State as the prevailing party on the motion. *Jones,* 343 Md. at 458, 682 A.2d 248; *Partee,* 121 Md.App. at 244, 708 A.2d 1113. We make our own independent constitutional appraisal based on a review of the law as it applies to the facts of the case. *Jones,* 343 Md. at 457, 682 A.2d 248.

 This case requires application of the Fourth Amendment of the United States Constitution, which protects against unreasonable searches and seizures.[5] U.S. CONST. amend. IV. The protections of the Fourth Amendment are applicable to the State of Maryland through the Fourteenth Amendment. *Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Owens v. State,* 322 Md. 616, 622, 589 A.2d 59 (1991). "The Fourth Amendment is not, of course, a guarantee against all searches and seizures, but only against unreasonable searches and seizures." *United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); *see also In re Tariq A–R–Y,* 347 Md. 484, 490, 701 A.2d 691 (1997). It is fundamental, under federal and Maryland jurisprudence, that

---

previously discussed, we are bound by the Superior Court decision with respect to that issue.

5. The Fourth Amendment provides:

"The right of the people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched or the things to be seized." U.S. CONST. amend. IV.

the detention of a motorist pursuant to a police traffic stop is a seizure encompassed by the Fourth Amendment. *See, e.g., Sharpe,* 470 U.S. at 682, 105 S.Ct. 1568; *United States v. Brignoni–Ponce,* 422 U.S. 873, 881, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Ferris v. State,* 355 Md. 356, 369, 735 A.2d 491 (1999); *Derricott v. State,* 327 Md. 582, 587, 611 A.2d 592 (1992).

 Absent a warrant or probable cause, the forced stop of a motorist may be had under the Fourth Amendment when the police officer is "able to point to specific and articulable facts which, taken together with rational inferences from these facts, reasonably warrant [the] intrusion." *Ferris,* 355 Md. at 384, 735 A.2d 491. The Supreme Court has held that this standard can be constitutionally applied to seizures based on suspicion of past criminal activity. *United States v. Hensley,* 469 U.S. 221, 229, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); *see also Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); *Pryor,* 122 Md.App. at 679, 716 A.2d 338. As the Supreme Court held,

> [I]f police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion.

*Hensley,* 469 U.S. at 229, 105 S.Ct. 675. Under such circumstances, the police are permitted to stop and briefly detain a person to investigate the suspicion. *See Derricott,* 327 Md. at 587, 611 A.2d 592. The Court of Appeals, however, "has consistently held that mere hunches are insufficient to justify an investigatory stop; for such an intrusion, an officer must have 'reasonable articulable suspicion.' " *Stokes v. State,* 362 Md. 407, 415, 765 A.2d 612 (2001)(citing *Ferris,* 355 Md. at 371, 735 A.2d 491); *see also Graham v. State,* 325 Md. 398, 408, 601 A.2d 131 (1992); *Quince v. State,* 319 Md. 430, 433, 572 A.2d 1086 (1990); *Derricott,* 327 Md. at 588, 611 A.2d 592; *Jones v. State,* 319 Md. 279, 287, 572 A.2d 169 (1990).

To determine whether an officer had reasonable articulable suspicion to justify a *Terry* stop, courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *Collins v. State,* 376 Md. 359, 368, 829 A.2d 992 (2003) (quoting *United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002), in turn quoting *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). The Court of Appeals has adopted the following six factors set forth by Professor La-Fave as appropriate considerations in determining what constitutes reasonable suspicion:

(1) the particularity of the description of the offender or the vehicle in which he fled; (2) the size of the area in which the offender might be found, as indicated by such facts as the elapsed time since the crime occurred; (3) the number of persons about in that area; (4) the known or probable direction of the offender's flight; (5) observed activity by the particular person stopped; (6) knowledge or suspicion that the person or vehicle stopped has been involved in other criminality of the type presently under investigation.

4 Wayne R. LaFave, Search and Seizure § 9.4(g), at 195 (3d ed. 1996 & 2000 Supp.); *accord Collins,* 376 Md. at 368, 829 A.2d 992; *Stokes,* 362 Md. at 420, 765 A.2d 612; *Cartnail v. State,* 359 Md. 272, 289, 753 A.2d 519 (2000); *State v. Lemmon,* 318 Md. 365, 378, 568 A.2d 48 (1990).

In *Collins v. State,* the Court of Appeals held that the police officer possessed reasonable articulable suspicion that Collins was involved in a recently reported robbery offense, and thus was justified in making the *Terry* stop. 376 Md. at 371–72, 829 A.2d 992. In *Collins,* the police officer arrived at the scene of the robbery of a convenience store, obtained a description of the robber from the store clerk, and promptly broadcast the description to other members of the police department. *Id.* at 363–64, 829 A.2d 992. On appeal, Collins argued that the officer who stopped and detained him did not have reasonable articulable suspicion to do so. *Id.* at 366, 829 A.2d 992. In making this argument, he stressed the disparity

between his actual height and weight and that reported by the robbery victim, as well as the fact that the victim reported the robber as wearing a black "nubbie hat" and a long sleeve grey shirt or sweatshirt with black stripes, whereas he was wearing a gray sweatshirt under a black coat without any striping. *Id.* at 369, 829 A.2d 992.

The Court in *Collins* rejected appellant's argument, explaining,

> In light not only of the ... points of agreement with respect to [Lafave's] first factor but of the other factors as well, the disparities urged by Collins are inconsequential. Collins was seen shortly after the robbery in the vicinity of and walking away from the store. There did not appear to be anyone else around, at least no one close to matching the description of the robber. The clerk said that the robber left on foot. Collins acted peculiarly when he spotted the police car, suddenly changing direction and heading for a telephone booth. Officer Jones could well infer, as he apparently did, that the sudden change in direction was intended to create a plausible reason for Collins being on the deserted lot late on a winter night to use the telephone. He was an African–American male wearing a "nubbie" and gray and black clothing. It was a January night, and, with winter clothing, a disparity in an estimate of weight would not be unusual.

The Court distinguished the facts presented in *Collins* from the facts of *Stokes*, 362 Md. 407, 765 A.2d 612 (2001), and *Cartnail*, 359 Md. 272, 753 A.2d 519 (2000). In *Stokes*,

> The lookout contained no description of height, weight, method of escape, or any get-away vehicle, but simply described a black male wearing a dark top. About 30 minutes later, the officer saw a black man, wearing a black leather jacket, drive into a parking lot just around the corner from the scene of the robbery at a high rate of speed, park diagonally across lined parking spaces, and get out of his car. The officer stopped the man, patted him

down, and felt a bulge, which turned out to be a controlled dangerous substance.

*Collins,* 376 Md. at 370–71, 829 A.2d 992 (citing *Stokes,* 362 Md. at 410–11, 765 A.2d 612). Based on these facts, the Court in *Stokes* held the frisk to be unlawful, noting not only the very general description of the robber, but also the improbability of the robber remaining in the immediate vicinity 30 minutes after the robbery. 362 Md. at 425–26, 765 A.2d 612.

The facts in *Cartnail* were similar to those in *Stokes.* In *Cartnail,*

> The police were told to be on the lookout for three black male robbery suspects, who had fled in an unknown direction in a gold or tan Mazda. About an hour and fifteen minutes after police received this information, and in close proximity to the robbery site, a patrol officer stopped Cartnail, a black male who was driving a gold Nissan and was accompanied by one black male passenger. Cartnail was arrested and charged for driving on a suspended license.

359 Md. at 277–78, 753 A.2d 519.

Based on these facts, the Court held that the officer did not have the reasonable articulable suspicion needed under the Fourth Amendment to stop Cartnail, and instead was merely acting on a "hunch." *Id.* at 277, 297, 753 A.2d 519. The Court noted that the only factors in the police description that matched Cartnail were his "gender, race, and arguably the color of [his] car." *Id.* at 293, 753 A.2d 519. The other factors, the Court stated, were "too tenuously corroborated, or not corroborated at all" by the circumstances. *Id.* The Court also considered the area where Cartnail was stopped and noted that "in one hour and fifteen minutes, the suspects could have remained in the City of Frederick or just as easily fled in the intervening time to Frederick County or even other urban centers such as Hagerstown, Baltimore, Washington, D.C., Annapolis, or rural areas in Maryland, Virginia, West Virginia, or Pennsylvania." *Id.* at 295, 753 A.2d 519. Thus, in holding the stop to be unlawful, the Court, as it did in *Stokes,* focused

on the range of flight available to the robber and the very general physical description given to police.

In the present case, as in *Stokes* and *Cartnail,* the officer was operating on a "hunch" when he stopped and detained appellant. The officer stated that, at the time he observed appellant, a black male, walking along the road in a dark cap and dark clothing, he was aware of a description of a burglary suspect involved in an attempted burglary seven days earlier. The officer was also aware that the burglary suspect in the incident "was wearing charcoal gray clothing, and a dark blue cap, and was a black male between 5'6" and 5'10" in height." Finally, the officer knew that "several weeks prior to this incident there were a number of burglary or criminal trespass related incidents" in the same general area.

Despite any similarities, however, between the vague description of the burglary suspect and appellant, the officer lacked reasonable articulable suspicion to stop and detain appellant. As the Court pointed out in *Stokes,* wearing dark clothing is not uncommon in the middle of the winter, and does not alone give rise to reasonable articulable suspicion. Additionally, the court in *Cartnail* found that similarities in race, gender, and car color were not enough to give rise to reasonable articulable suspicion.

In this case, aside from appellant's race and the color of his clothing, the other factors giving rise to reasonable suspicion, as in *Cartnail,* were "too tenuously corroborated, or not corroborated at all." The prior reported crimes occurred anywhere from one half mile to ten miles away, and a week to a month prior to the stop of the appellant. In a week's time, the perpetrator could have traveled to any place in the continental United States. The officers' observations of appellant apparently covering his face, and then getting in his car and driving off, without more, are also too attenuated to provide the basis for reasonable suspicion.

### III.

Despite the above, we affirm the circuit court's ruling because we decline to apply the exclusionary rule in this

situation. Our conclusion is supported by our decision in *Brown v. State*, 124 Md.App. 183, 720 A.2d 1270 (1998). In that case, the defendant contended the trial court erred in denying his motion to suppress a statement he gave to the police. *Id.* at 188–89, 720 A.2d 1270. Appellant acknowledged that he was legally stopped pursuant to *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), but contended that he was illegally detained after the purpose of the stop had been fulfilled. *Brown*, 124 Md.App. at 189, 720 A.2d 1270. We agreed that the defendant had been subjected to an extended detention or "second stop" that was not justified. *Id.* at 189, 720 A.2d 1270. During that extended period of time, the police officer received information that there was an outstanding arrest warrant, and the officer arrested the defendant. *Id.* at 188, 720 A.2d 1270. Subsequently, the defendant gave an inculpatory statement. *Id.* We concluded that the statement was the product of his arrest on the outstanding warrant, supported by probable cause in existence prior to the illegal detention, and not the product of the illegal detention. *Id.* at 202, 720 A.2d 1270.

In *Brown*, we relied heavily on *New York v. Harris*, 495 U.S. 14, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990), and *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), part of a long line of decisions addressing the exclusionary rule. *See also Wong Sun v. United States*, 371 U.S. 471, 485–486, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (under the "fruit of the poisonous tree" doctrine, evidence acquired by the police through an illegal arrest will be excluded from a subsequent criminal prosecution). The exclusionary rule does not apply if the connection between the illegal conduct and the discovery of evidence has become sufficiently attenuated. *Id.*

In *Brown v. Illinois*, the Supreme Court considered whether incriminating statements given by a defendant after his illegal arrest had to be excluded or whether they were admissible because of the prior reading of *Miranda*[6] warnings. 422

---

**6.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

U.S. at 591–92, 95 S.Ct. 2254 (1972). The Court employed a balancing approach and stated that the *Miranda* warnings were an important factor in determining whether the confession was obtained by exploitation of an illegal arrest. *Id.* at 603, 95 S.Ct. 2254. The Court identified as additional factors the temporal proximity of the arrest and the confession, the presence of intervening circumstances, and the purpose and flagrancy of the misconduct. *Id.* at 603–604, 95 S.Ct. 2254.

In *New York v. Harris*, 495 U.S. at 16–17, 110 S.Ct. 1640, the Supreme Court considered whether an inculpatory statement was the product of an illegal arrest. The Court held the police had probable cause to arrest Harris, but their entry into his home without a warrant was illegal. *Id.* at 17, 110 S.Ct. 1640. The question was whether a statement given at the police station after *Miranda* warnings should have been suppressed. *Id.* at 16, 110 S.Ct. 1640. The Court answered that question in the negative, explaining that, because the police had probable cause to arrest him, he was not in unlawful custody when he was taken to the police station. *Id.* at 18, 110 S.Ct. 1640. Noting the attenuation approach in *Brown v. Illinois,* the Court explained that "attenuation analysis is only appropriate where, as a threshold matter, courts determine that 'the challenged evidence is in some sense the product of illegal government activity.'" *Id.* at 19, 110 S.Ct. 1640 (quoting *United States v. Crews,* 445 U.S. 463, 471, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980)).

In our decision in *Brown v. State,* 124 Md.App. 183, 720 A.2d 1270 (1998), we relied on several decisions in addition to the Supreme Court decisions discussed above. For example, in *Torres v. State,* 95 Md.App. 126, 129, 619 A.2d 566 (1993), we applied *New York v. Harris,* 495 U.S. 14, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990), and held that, because probable cause existed to question the defendant before the illegal arrest, there was "a clean break in the chain of cause and effect," and the arrest became valid once the defendant was removed from the protected premises. *Id.* at 131, 619 A.2d 566.

We also relied on the Seventh Circuit's decision in *United States v. Green*, 111 F.3d 515 (7th Cir.1997). Since our decision in *Brown*, the Seventh Circuit, in *United States v. Johnson*, 383 F.3d 538 (7th cir.2004), has reaffirmed its holding in *Green*, and the Sixth Circuit, in *United States v. Hudson*, 405 F.3d 425, 439–441 (6th cir.2005), approved the Seventh Circuit decisions. The Sixth Circuit distinguished situations in which an officer makes an illegal stop for the purpose of enforcing an outstanding warrant from situations in which the officer makes an illegal stop and subsequently and independently discovers an outstanding warrant. *Id.* at 440. In other words, if the purpose of the stop is to enforce a warrant, and the stop is unlawful, evidence subsequently obtained is subject to suppression. If the purpose of the stop is not for purposes of the warrant, even though the stop was unlawful, evidence obtained is not subject to suppression on the basis that the stop was unlawful.

In *Green*, police officers illegally stopped the defendant's vehicle. During the course of the stop, the officers discovered that a passenger in the vehicle was wanted on an outstanding warrant. The officers arrested the passenger and searched the vehicle incident to arrest. The officers discovered controlled dangerous substances and a gun. They then arrested the driver. The driver moved to suppress the drugs and gun. The Seventh Circuit held that the lawful arrest on an outstanding warrant constituted an intervening circumstance that dissipated any taint caused by the initial illegal stop. 111 F.3d at 522. In comparison to other instances in which the Supreme Court has permitted the admission of evidence acquired after an unlawful action, "[w]here a lawful arrest pursuant to a warrant constitutes the 'intervening circumstance,' it is an even more compelling case for the conclusion that the taint of the original illegality is dissipated." *Id.* at 522. Indeed, according to the court, "[i]t would be startling to suggest that because the police illegally stopped an automobile, they cannot arrest an occupant who is found to be wanted on a warrant." *Id.* at 521.

Subsequent to *Green* and our decision in *Brown*, several other state decisions have endorsed this reasoning.[7] That is, these courts have held that,

despite the unlawfulness of an initial investigative stop, if the only connection between that initial illegality and later-discovered evidence is the disclosure of the defendant's identity and the discovery of a pre-existing warrant for the defendant's arrest, the arrest warrant will be deemed an intervening, untainted justification for an ensuing arrest and search-and, thus, any evidence discovered incident to that arrest will be admissible against the defendant.

*McBath*, 108 P.3d at 246 (citations omitted). For instance, in *Fletcher* the court explained:

Discovery of an outstanding warrant during an illegal detention of an individual breaks the connection between the discovered evidence and the primary taint ... [T]he independent probable cause evidenced by the valid arrest warrants demonstrates that the evidence found during the search of appellant's person was not discovered through exploitation of the initial illegal arrest.

90 S.W.3d at 420 (quoting *Reed v. State*, 809 S.W.2d 940 (Tex.App.1991)).

In the case before us, there was an illegal stop, but there was a preexisting arrest warrant. The officer did not make the stop for the purpose of enforcing the warrant, and in fact, did not know that the then-unidentified person in the vehicle was subject to an outstanding warrant.[8] Whether we

---

7. *See State v. Hill*, 725 So.2d 1282 (La.1998); *People v. Murray*, 312 Ill.App.3d 685, 245 Ill.Dec. 430, 728 N.E.2d 512 (2000); *State v. Jones*, 270 Kan. 526, 17 P.3d 359 (2001); *Fletcher v. State*, 90 S.W.3d 419 (Tex.App.2002); *Quinn v. State*, 792 N.E.2d 597 (Ind.App.2003); *Hardy v. Commonwealth*, 149 S.W.3d 433 (2004); *State v. Page*, 140 Idaho 841, 103 P.3d 454 (2004); *McBath v. State*, 108 P.3d 241 (Alaska Ct.App.2005); *State v. Bigham*, 141 Idaho 732, 117 P.3d 146 (2005); *but see, e.g., Frierson v. State*, 851 So.2d 293 (Fla.Dist.Ct.App.2003); *Sanchez v. State*, 803 N.E.2d 215 (Ind.App.2004).

8. Neither appellant's person nor his identity was a "fruit" of the illegal stop. *Crews*, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537; *Modecki v. State*, 138 Md.App. 372, 771 A.2d 521 (2001).

employ the balancing approach of *Brown v. Illinois* or conclude that it is not applicable, as in *New York v. Harris,* we come to the same conclusion. The exclusionary rule does not require suppression of the evidence obtained as a result of the search incident to a valid arrest on an outstanding warrant. We, therefore, affirm the circuit court's ruling on the motion to suppress.

### Sufficiency of the evidence

The standard for appellate review of evidentiary sufficiency is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See, e.g., Jackson v. Virginia,* 443 U.S. 307, 313, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Moye v. State,* 369 Md. 2, 12, 796 A.2d 821 (2002); *White v. State,* 363 Md. 150, 162, 767 A.2d 855 (2001). "Weighing the credibility of the witnesses and resolving any conflicts in the evidence are tasks proper for the fact finder." *State v. Stanley,* 351 Md. 733, 750, 720 A.2d 323 (1998); *see also Jackson,* 443 U.S. at 313, 99 S.Ct. 2781; *McDonald v. State,* 347 Md. 452, 474, 701 A.2d 675 (1997), *cert. denied,* 522 U.S. 1151, 118 S.Ct. 1173, 140 L.Ed.2d 182, (1998)(quoting *State v. Albrecht,* 336 Md. 475, 478, 649 A.2d 336 (1994)). "We give 'due regard to the [fact finder's] findings of facts, its resolution of conflicting evidence, and, significantly, its opportunity to observe and assess the credibility of witnesses.'" *Moye,* 369 Md. at 12, 796 A.2d 821 (quoting *McDonald,* 347 Md. at 474, 701 A.2d 675, in turn quoting *Albrecht,* 336 Md. at 478, 649 A.2d 336).

We do not re-weigh the evidence, but "we do determine whether the verdict was supported by sufficient evidence, direct or circumstantial, which could convince a rational trier of fact of the defendant's guilt of the offenses charged beyond a reasonable doubt." *White,* 363 Md. at 162, 767 A.2d 855.

The law is settled that at least two separate inferences may follow from the predicate fact of possession of

recently stolen goods. *Offutt v. State,* 55 Md.App. 261, 264, 463 A.2d 876 (1983). As the Court of Appeals has stated,

> We have long and consistently held that exclusive possession of recently stolen goods, absent a satisfactory explanation, permits the drawing of an inference of fact strong enough to sustain a conviction that the possessor was the thief ...; or, under the appropriate circumstances, that the possessor was the receiver of stolen goods[.]

*Id.* (quoting *Brewer v. Mele,* 267 Md. 437, 449, 298 A.2d 156 (1972)); *see also Graham v. State,* 6 Md.App. 458, 251 A.2d 616 (1969)("The law is clear that the recent, exclusive possession of stolen goods creates an inference of fact that the possessor was the thief or the burglar and casts upon him the burden to give a reasonable explanation of how he came into such possession[.]").

The requirement that goods be recently stolen is a relative one. *Graham,* 6 Md.App. at 463, 251 A.2d 616; *Gamble,* 2 Md.App. 271, 275, 234 A.2d 158 (1967). In *Gamble,* this Court explained: "The term recent when used in connection with recently stolen goods, is a relative term, and its meaning as applied to a given case will vary with the circumstances of the case." 2 Md.App. at 275, 234 A.2d 158 (quoting *Anglin v. State,* 1 Md.App. 85, 92, 227 A.2d 364, (1967), in turn quoting *Butz v. State,* 221 Md. 68, 77, 156 A.2d 423 (1959)); *see also Graham,* 6 Md.App. at 463, 251 A.2d 616 ("The meaning of 'recent' in this context depends upon the circumstances of each case[.]"). Appellant does not challenge whether the stolen goods recovered from 26 Belview Avenue were recently stolen and, as such, it is unnecessary for us to decide the issue. We note, however, that the circumstances of this case support a finding that the goods were recently stolen.

Moreover, the term possession in this context does not necessarily require actual manual possession by an accused as long as he obtains a measure of control or dominion over the stolen goods. *Gamble,* 2 Md.App. at 275, 234 A.2d 158. Additionally, possession may be joint. *Graham,* 251 A.2d at 620,. In other words, as we have consistently held,

"joint possession does not negate the notion of exclusive possession." *Offutt,* 55 Md.App. at 263, 463 A.2d 876 (citing *Sutton v. State,* 8 Md.App. 285, 297, 259 A.2d 561 (1969)). In *Sutton,* four separate persons were found in joint possession of stolen property, and the inference of theft was "permitted to flow from that recent and joint exclusive possession." *Id.* With respect to such joint possession, we reasoned in *Folk v. State,*

> The common thread running through all of these cases affirming joint possession is 1) proximity between the defendant and the [stolen property], 2) the fact that the [stolen property] was within the view or otherwise within the knowledge of the defendant, 3) ownership or some possessory right in the premises or the automobile in which the [stolen property] is found, or 4) the presence of circumstances from which a reasonable inference could be drawn that the defendant was participating with others in the mutual use and enjoyment of the [stolen property].

11 Md.App. 508, 518, 275 A.2d 184 (1971).

In *Offutt,* the defendant was convicted of theft and argued on appeal that the evidence was insufficient to sustain the conviction. 55 Md.App. at 263, 463 A.2d 876. Specifically, the defendant admitted that the stolen property was found in the apartment which he occupied with his live-in companion, but argued that the property was, therefore, in the joint possession of him and his companion and not in his exclusive possession. *Id.* We rejected defendant's argument, explaining,

> [J]oint possession does not negate the notion of exclusive possession as that term is used in reference to the permitted inference that may be drawn from such possession. . . .
> It is . . . clear that the evidence with respect to the appellant's residence in the apartment (including keeping his clothes there, having his own keys, using it as his address of record . . . and sleeping in the very master bedroom wherein the stolen gun was found) was a legally sufficient predicate for a jury finding that he was, at least, in joint possession of the stolen gun. . . . [T]he evidence was, there-

fore, legally sufficient to support a jury finding that the appellant was the thief[.]

*Id.* at 263–64, 463 A.2d 876.

 In this case, appellant was charged with theft by possession and stipulated that property that Mr. Marinelli identified as his was recovered from 26 Belview Avenue. He contends, however, that the male clothing and mail addressed to him found at 26 Belview Avenue were legally insufficient to connect him with the stolen property because the items were never introduced into evidence.

We think it is unnecessary that the items themselves be introduced into evidence, however, because there was sufficient testimony connecting appellant to the Belview residence. In addition to testimony regarding the mail and clothing found at the residence, the testimony of Investigator Alton also connected appellant to the Belview residence. When asked if anything relating to the burglaries was recovered from Myers the night of the traffic stop, Alton testified, "in the vehicle there [were] several pieces of jewelry that were connected to the burglaries in Washington County, and, on his person were some proprietary documents that we linked to an address in Hagerstown [26 Belview Avenue] where he was staying." Alton then explained that, based on that address, the police "obtained ... a search warrant for that residence." The testimony provided at the hearing was sufficient to connect appellant to the Belview residence, and to find that he was in exclusive possession of recently stolen goods that were found therein.

 Similarly, we reject appellant's second argument that there was insufficient evidence to convict him of felony theft by possession. Mr. Marinelli testified that the value of all of his property clearly exceeded $500. It appears appellant is arguing that only the property found at the premises searched can be considered. Assuming that to be true, Marinelli testified that items recovered from the Belview residence were returned to him, including two watches, a backpack, a strongbox, and pocket knives. Martinelli testified that the value of

the two watches was $760.00. A jury could rationally find that the items found at the Belview residence alone had a value in excess of $500.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**